CHICK et al. v. FULLER et al.

(Circuit Court of Appeals, Seventh Circuit. January 21, 1902.)

No. 682.

1. CORPORATIONS—LIABILITY OF DIRECTORS—NEGLIGENCE IN PERFORMANCE OF DUTY.

Directors of an insolvent manufacturing corporation cannot be held individually liable to creditors either on the ground of negligence in the discharge of their duty or under the statute of Illinois because they declared and paid a dividend to stockholders when the company was insolvent, and permitted the creation of indebtedness exceeding its capital stock, where it is not satisfactorily shown that in the exercise of ordinary diligence they should have known that the company was insolvent when the dividend was declared, or that the indebtedness was being created; and the evidence is insufficient to charge them with notice of such facts where it shows that the president, who was the active manager of the business, deliberately wrecked the company, and defrauded both stockholders and creditors by embezzling the proceeds of goods sold and substituting fictitious notes, purporting to have been given by customers therefor, and by falsifying the books, which failed to show indebtedness for materials purchased on credit, but, on the contrary, showed the company to be solvent, and the business prosperous, and it does not appear that the directors had any reason to suspect the

president's integrity until after the dividend had been declared and the indebtedness created.[1]

**2. SAME—VALIDITY OF MORTGAGE—PREFERENCE OF DIRECTORS AND STOCK-HOLDERS.**

A mortgage given by a corporation to secure bonds issued to pay its indebtedness to two banks, in which directors and stockholders of the corporation were large stockholders, at a time when the corporation was in fact insolvent, and shortly before it suspended business, *held*, under the evidence, to have been given in good faith, while the corporation was a going concern, and in the expectation that its business would be continued. and to be valid, the directors and stockholders who were secured thereby being ignorant of the company's insolvent condition.

Grosscup, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The bill was by appellants, judgment creditors of the Northwestern Shoe Company, and in behalf of all other creditors of that company who might join in the suit against the appellees, (a) to set aside certain alleged preferences said to have been made by the directors and officers of the Shoe Company to the appellees, Allen C. Fuller, the First National Bank of Belvidere and the Second National Bank of Belvidere; (b) to hold the directors and officers (Allen C. Fuller, John J. Foote, David D. Sabin, and Calvin D. May and Steven D. May, as executors of Ezra May, deceased, being the only ones involved in this appeal) responsible to appellants for alleged negligence in the management of the assets and property of the company; (c) to hold the directors liable for assenting to and paying a dividend when the corporation was insolvent; and (d) to hold the directors liable for assenting to the incurring of indebtedness in excess of the capital stock of the corporation.

Upon the filing of the respective answers of appellees, and the replication, the court below referred the cause to a master, who found, in substance, as follows: (a) That the directors were liable to the complaining creditors for negligent discharge of their duties; (b) that the directors were liable for the declaration and payment of a dividend when the shoe company was insolvent; (c) that the directors were liable for assenting to indebtedness of the company in excess of its capital stock; and (d) that the payments made to the First and Second National Banks of Belvidere and Allen C. Fuller from the avails of the twenty-five thousand increase of stock, and the issuance and delivery of the fifty thousand dollars of bonds (hereinafter set forth more at large), were in the nature of a fraudulent preference, and should be vacated, and the mortgage set aside.

Exceptions were filed by the appellees. and sustained by the court below, and the bill dismissed. From this decree the appeal is prosecuted.

The further facts are stated in the opinion of the court.

The opinion of the circuit court by JENKINS, Circuit Judge, was as follows:

"I have given to this case a careful consideration of the evidence and the arguments of counsel, but am compelled to state the conclusions to which my mind is forced without elaboration or special argument. The case presents itself in four aspects: (a) General liability of the directors for negligence; (b) their liability under the statutes of Illinois for assenting to the incurring of indebtedness beyond the capital stock of the corporation; (c) their liability under the statutes of Illinois for assenting to and paying a dividend when the corporation was insolvent; and (d) invalidity of the trust deed executed July 1, 1892.

"The general principles by which to judge the liability of directors for negligence are authoritatively established by the decision in Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, and are also well

---

[1] Personal liability of directors of corporations for negligence, see notes to Robinson v. Hall, 12 C. C. A. 680; Warner v. Penoyer. 33 C. C. A. 230.

stated in Association v. Childs, 82 Wis. 460, 52 N. W. 600, 33 Am. St. Rep. 57. The statute of Illinois imposing liability upon directors for assenting to indebtedness in excess of capital stock is paragraph 16, c. 32, p. 1007, 1 Starr & C. Ann. St. (2d Ed.), and provides that a director, assenting to the incurring of indebtedness by a corporation in excess of its capital stock, shall be personally and individually liable for such excess to the creditors of such corporation. This statute, as I think, clearly implies that the director assenting must do so knowingly, or be guilty of such gross negligence with respect to informing himself of the conditions of the corporation, when prudent action would readily have informed him of its condition, that the law will presume knowledge. The liability imposed by statute upon directors with respect to the declaring of dividends under certain conditions is paragraph 19 of the same chapter, and implies the same assent and knowledge upon the part of the director in declaring a dividend when the company is insolvent, or which would render it insolvent, or which would impair its capital stock.

"The fraud which wrecked this corporation was artful, bold, and cunningly concealed. Graff, the president, and his co-conspirators, purposely omitted to report to and concealed from the bookkeeper and directors, and purposely omitted to enter upon the books of the corporation, all of the purchases made, so that much of the indebtedness of the corporation for goods purchased was concealed from the bookkeeper and from the directors. Graff caused to be shipped to Chicago to fictitious consignees a large amount of manufactured goods, sold them there for cash, and appropriated the proceeds. He returned to the company fictitious or forged notes as the avails of the property sold; these pretended sales, of course, being reported by him and appearing upon the books of the corporation. These notes were discounted by Graff for the corporation with the banks at Belvidere, and furnished the means by which the business was conducted. I fail to find in the evidence any actionable negligence upon the part of the directors, who have excepted to the master's report. When the citizens of Belvidere first became interested in the Graff concern, and procured its removal to Belvidere, they subscribed for and paid in in cash $15,000 to the capital stock, and the donation in addition of $7,500. The inventory of the property put in by Graff and Harris was procured to be made by those citizens of Belvidere who had interested themselves in the concern, and it was valued at $25,000, the amount invested or supposed to be invested by Graff and Harris, who were the active conductors of the business. They appeared to the citizens of Belvidere as active, energetic business men. There was nothing to suggest that Graff and Harris were not as honorable as they were energetic. It is said that the directors failed to have examination of the books. If this be true, with respect to any particular period of the time, such examination would have disclosed nothing of the fraud, and would have led to no result. These directors, who are sought to be charged with liability for negligence, acted certainly in entire good faith. In the early part of 1892, they took the unissued stock of $10,000 at par or over, advancing their own money to aid the concern. As late as the 28th of June, to the 1st of July, 1892, they increased the capital stock by the sum of $25,000 to relieve the corporation from what they supposed to be temporary embarrassment arising from attempting to do too large a business on a capital of $50,000, and paid in their own money into the concern. When Harris became obnoxious, for some reason, to the directors, or some of them, they purchased his stock at above par, and, as they supposed, got him out of the concern. They certainly acted in entire good faith, and evidenced their confidence in the corporation by their constant investment of money. They had no interest to subserve except to protect the corporation, its creditors, and themselves. I have been unable to see any one act of neglect upon their part during the time they respectively held their offices as directors, which resulted in injury to the creditors. Under the decisions referred to I am of opinion that they are not liable for negligence. I may add with respect to the director (May) who departed this life before the report of the master, and whose executors have been substituted in his place, that in my judgment the action for such negligence, irrespective of statutory liability, does not survive the death of the

party, but dies with him; and the executors should be discharged, also, upon that ground.

"With respect to the liability imposed by the statute for assenting to debts in excess of the capital stock, it is contended that the corporation indorsement of business paper discounted at the banks is a liability within the meaning of the statute. The liability of the corporation as indorser had not been fixed. It was contingent upon nonpayment of the notes at maturity, and the corporation being charged by proper proceedings for the amount of the note, I do not think the statute contemplates such an indebtedness as that, for it would be wholly impossible for any stock corporation to carry on business without rendering all its directors personally liable. The indebtedness contemplated in the statute is the direct and absolute liability of the corporation for the goods and property procured for its use. Eliminating this feature of the transaction, there is nothing upon the books to show that the indebtedness of the corporation exceeded its capital stock at the time charged, nor anything to show that these directors knowingly assented to such increase, or were guilty of any neglect of proper action which would have informed them of the true condition of affairs brought about by the fraud of Graff and his co-conspirators. The same may also be said with respect to the declaration of a dividend in the early part of 1892. The trial balance presented to the board by the president of the company, showed, as did the books, a profit which warranted a dividend. That the actual fact did not so warrant was because the concealed fraud of Graff either rendered the company insolvent at that time, or made the declaring of a dividend improvident. But most certainly these directors did not assent to the declaration of a dividend with any knowledge of such insolvency or improvidency. I find nothing in the testimony or in the facts reported by the master which warrants the conclusion reached with respect to the liability of the directors upon either of the three grounds considered.

"I have had more doubt with respect to the validity of the mortgage of July 1, 1892, under which $50,000 of bonds were issued to retire the indebtedness of the bank. The court of appeals for the circuit in Sutton Mfg. Co. v. Hutchinson, 11 C. C. A. 320, 63 Fed. 496, 24 U. S. App. 147, had occasion to consider when and under what circumstances a corporation could prefer creditors, and it was there ruled that when a corporation has become insolvent and suspends the prosecution of its business, or when it is seen that the business can no longer be prosecuted, then the directors become trustees for all the creditors and cannot give a preference. Does this case fall within that ruling? Contemporaneously with the issuing of this mortgage the directors increased the capital stock, and paid their own money therefor to take up the indebtedness of the corporation; and at the same time, in order, as they supposed, to place the company upon a firm basis, and to take up all the outstanding indebtedness to the banks of which they were informed, issued this trust deed, proposing to continue the business, and having no knowledge at that time of the frauds of Graff and Harris and their co-conspirators. They did not acquire that knowledge until after September 2, 1892, when, it would seem, creditors of the company came forward with attachments, of whose debts they, up to that time, had no knowledge whatever, at least, as to the amount, and whose debts, or the most thereof, did not appear upon the books, and they then ascertained that these notes, which Graff had turned over in payment of supposed purchases and sales of goods, were fictitious, and the fraud was disclosed which wrecked the corporation. There was no intent by this trust deed to give a preference to these banks over other creditors. It was supposed that all creditors would be taken care of and the treasury of the corporation repleted by funds arising from the subscriptions to further stock. There was no design to close up the corporation, but the purpose and object was to continue its business, and as it seemed to the directors it could be continued successfully and profitably. That there was failure in this regard arose from no fault of theirs, but from the subsequently discovered frauds of Graff and Harris which had been concealed from the directors. I think, therefore, that under the circumstances this trust deed was valid and effectual to secure the

bonds, and that their issue of bonds was valid in the hands of the creditors to whom they were delivered.

"It follows that this bill must be dismissed as to the defendants Foote, Sabin, Fuller, the executors of May, the First National Bank of Belvidere, and the Second National Bank of Belvidere. With respect to the exceptions filed, they are all sustained, except the tenth exception of the defendant Fuller, which is overruled, and the eighteenth, twenty-third, and twenty-fourth exceptions, which are overruled, because not specific. Of the exceptions of Foote and Sabin, the first exception is overruled, and the last sentence of the ninth is overruled. The twenty-eighth exception is overruled. The twenty-ninth, thirty-fourth, and thirty-fifth are overruled because not specific. I have not the exceptions filed by the executors of May before me, but the views stated will indicate which exceptions should be sustained and which overruled. A decree may be prepared in conformity with this opinion."

Wm. Z. Manning and A. W. Bulkley, for appellants.

Frank F. Reed and Charles H. Aldrich, for appellees.

Before GROSSCUP, Circuit Judge, and BUNN and SEAMAN, District Judges.

After the foregoing statement, the opinion of the court was delivered by GROSSCUP, Circuit Judge.

The facts rightly settled, this case involves no controverted questions of law. The evidentiary facts are voluminous, but the findings upon which the case turns, including what seems necessarily prefatory, may be summed up as follows:

In 1890 the Northwestern Shoe Company of Chicago entered into negotiations with certain citizens of Belvidere, Illinois, looking toward the transfer of the shoe company from Chicago to Belvidere. As a result of these negotiations, a public meeting was held in Belvidere, and a committee consisting of three of its citizens, John Hannah, Levi Murch, and James Cook, was appointed to visit the factory of the shoe company at Chicago, and investigate the standing of the concern and its management.

The committee proceeded to Chicago; made an examination of the machinery, books, and stock in trade of the company; had conversations with Barnett Graff, its then president, and Frank Harris, its then secretary, respecting the profits, assets and business of the company; and, upon returning to Belvidere, submitted a report favoring the transfer.

In reliance upon this report, the citizens of Belvidere accepted a proposition submitted to them by Barnett Graff, asking, as a consideration for the transfer, that the capital stock of the company—then five thousand dollars—be increased to fifty thousand dollars; that twenty-five thousand dollars of this stock be issued to Barnett Graff, Frank Harris and Jacob Graff, in return for tools, machinery and merchandise to be transferred; that the citizens of Belvidere subscribe for fifteen thousand dollars; leaving ten thousand dollars of the stock in the treasury. It was asked, also, that a donation should be made to the company of seven thousand five hundred dollars for the purchase of a site upon which to erect a factory; the shoe company, on its part, to employ, for a certain period of years, a minimum number of men in such factory; and to give a mortgage

upon the land and buildings so purchased and erected as security therefor.

In pursuance of the above arrangement, the citizens of Belvidere named Allen C. Fuller, John Hannah, Ezra May, W. D. Swail, S. S. Whitman and E. L. Lawrence, a committee to secure the cash bonus of seven thousand five hundred dollars, and to sell the fifteen thousand dollars stock of the company. This committee selected the site and erected the factory, at a total cost of thirteen thousand five hundred dollars, and turned the balance, nine thousand dollars, over to the treasury of the company.

Accordingly, Barnett Graff, Jacob Graff, and Frank Harris, shipped to Belvidere the machinery, tools, fixtures, etc., belonging to the Northwestern Shoe Company in Chicago, which were appraised at the instance of the committee, by Samuel C. Tribou (general manager and superintendent of the Rockford Shoe Company of Rockford, Illinois) at twenty-five thousand dollars; and thereupon stock to that amount was issued to Barnett Graff and his associates, certificates amounting to fifteen thousand dollars being issued to the Belvidere stockholders.

February 13, 1891, having completed the work intrusted to it, the committee submitted a written report to the stockholders of the reorganized Northwestern Shoe Company, and were discharged; and F. R. Smiley, Ezra May, Barnett Graff, Jacob Graff, and Frank Harris were thereupon elected directors of the new company, Barnett Graff being elected president and treasurer, and Frank Harris secretary. January 11, 1892, Allen C. Fuller, D. D. Sabin, Barnett Graff, John Hannah, and Frank Harris were elected directors. January 20, 1892, E. L. Lawrence succeeded Frank Harris as director. March 9, 1892, John J. Foote succeeded Allen C. Fuller as director. No further change took place on the board until August 9, 1892, when John J. Foote was succeeded by Irving Terwilliger.

The shoe company continued doing business until September 2, 1892. In the meantime the ten thousand dollars treasury stock was issued at par, and the money therefor received; and June 28, 1892, a further issue of twenty-five thousand dollars of stock was made—ten thousand being taken by Graff, and the balance by the Belvidere stockholders and directors—the avails being used to pay off the indebtedness to the First and Second National Banks of Belvidere and Allen C. Fuller. July 1, 1892, bonds were issued to the amount of fifty thousand dollars, secured by trust deed upon the entire property, and were used to take up the indebtedness then due to the First and Second National Banks of Belvidere. Additional to these transactions, during this interval, Graff, in the name of the shoe company, contracted debts with other parties, on account of goods purchased, to the amount of some twenty-eight thousand dollars, inclusive of the indebtedness due to the complaining creditors. But only a small amount of this appeared on the books of the company. When the crash came in September, 1892, the available assets did not exceed thirty-one thousand dollars; it being found, among other things, that of the outstanding accounts and bills receivable, amounting in all to some ninety thousand dollars,

as shown by the books to be due the company, only about five thousand dollars were collectible, the balance being largely fictitious.

There is no doubt that these transactions concealed and carried out a monstrous fraud; but it is not insisted that the appellees were purposely parties to the fraud; indeed, they were, to a large degree, victims, for they continued putting into the company, from time to time, fresh money. The deception that was practiced upon the complaining creditors, and also upon the appellees, was brought about principally by, (a) a gross overvaluation of the assets, at Chicago, upon which the twenty-five thousand dollars par value stock was issued to the Graffs and Harris; (b) the imposition upon the banks, and the shoe company of fictitious notes, said by Graff to be in payment by customers of goods previously sold; (c) a continuation, after removal to Belvidere, of this practice of bringing forward and discounting fictitious notes upon the pretense that they were in payment of goods sold to various customers; (d) the removal from the factory of manufactured goods ostensibly shipped to designated consignees, but, in fact, sold for cash, and the proceeds appropriated by Graff; and (e) omission from the books of the company of the greater part of purchases made (including those from complaining creditors) whereby a large portion of the indebtedness of the company was concealed from the stockholders and directors.

There is nothing in the record showing that the appellees, either as individuals, or directors, actually knew that the company was insolvent when the dividend complained of was declared; or that, prior to June, 1892, the indebtedness of the company exceeded the capital stock. The contention, at most, is that, owing to their negligence in taking note of the affairs of the company, they constructively had such knowledge. The whole question of liability in these respects seems to center around the inquiry, Should the appellees, in the exercise of the diligence required of them by law, have known, at the time of the transactions, the true state of the company's affairs.

After a careful study of all the evidence, our conclusions respecting the general questions of fact involved may be stated as follows:

First, taking into consideration everything that would naturally influence the committee, including a reasonable confidence in the statements of Graff, and doubtless some anxiety to obtain for their town the industry represented by the shoe company, it is not clear that men of ordinary carefulness, acting in their place, would have discovered that the company's Chicago assets were overvalued.

Second, it is not satisfactorily shown that, until near the culmination of the company's career, and after the indebtedness due to the complaining creditors had been contracted, the appellees had the means of knowing, without the exercise of unusual acuteness and diligence, that the notes said by Graff to have been in payment of goods sold to various customers were, in fact, fictitious.

Third, it is not satisfactorily shown that there came to the directors, prior to the failure, evidence to put them upon notice that

the goods shipped from the factory to the consignees named on the books were, in fact, never delivered to such consignees.

Fourth, there is not evidence sufficient to justify a finding that, until near the culmination of the company's career, and after the indebtedness to the complaining creditors had been contracted, the appellees ought, in the exercise of ordinary diligence, to have known that the books were falsely kept, and that there existed, from time to time, indebtedness that was not shown there.

Upon the basis of these findings, we cannot hold the appellees chargeable on account of the dividend declared, for, at the time the dividend was so declared, they had no means, sufficient to put them on notice, of knowing the insolvency of the company; nor can we hold the appellees to have assented to indebtedness in excess of the capital stock, for, at the time the indebtedness was created, they had no means, sufficient to put them upon notice, of knowing that such indebtedness was being created; nor can we hold them liable, upon any common-law obligation, to the complaining creditors, for negligent discharge of their duties, for, at the time the debts due the complaining creditors were contracted, the appellees had no means, sufficient to put them on notice, of knowing that the affairs of the company were not being honestly managed, and that the company was not financially sound.

Upon the remaining question—the preference given to Fuller and the banks—the members of the court entertain a difference of opinion.

The majority of the court are of the opinion that the mortgage or trust deed of July 1, 1892, securing fifty thousand dollars of bonds, was authorized in good faith to retire that amount of bona fide corporate indebtedness to the banks, and so used and accepted in like good faith, and that the mortgage was executed by a going concern, to secure its indebtedness, after the stockholders had put in their capital for the undoubted purpose of continuing the business; which was so continued up to the failure of September, 1892.

Upon this finding of fact—not concurred in, however, by the writer of this opinion—the transaction would not be within the condemnation of Sutton Mfg. Co. v. Hutchinson, 24 U. S. App. 145, 11 C. C. A. 320, 63 Fed. 496, or any case cited, but is upheld in all material features by the authorities, both federal and state. Hollins v. Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113; Sandford Fork & Tool Co. v. Howe, Brown & Co., 157 U. S. 312, 15 Sup. Ct. 621, 39 L. Ed. 713; Rockford Wholesale Grocery Co. v. Standard Grocery & Meat Co., 175 Ill. 89, 51 N. E. 642, 67 Am. St. Rep. 205, and cases cited. In the Sutton Case, the insolvent corporation mortgaged all its property to another corporation to secure its over-drafts, with the intention and effect of closing all further prosecution of its business immediately thereupon; and this when both corporations, debtor and creditor, were managed by the same officers and directors and the capital stock owned substantially by the same persons. On the contrary, in the finding of fact arrived at by the majority of the Court, the mortgage under consideration was executed by a going concern to secure its indebtedness for the

purpose of continuing the business, and was reinforced by fresh money contributed by the stockholders in good faith to the same end. This unquestionably would bring this case clearly within the distinctions pointed out in Sandford Fork & Tool Co. v. Howe, Brown & Co., supra, as sustaining the mortgage there in question.

In addition to this, the majority of the Court are of the opinion that the fact that two of the five directors of the shoe company, or that certain of its stockholders, were likewise either directors or stockholders of one or the other bank, receiving the security—all being free from knowledge of the true state of affairs as heretofore indicated—cannot in any view operate to invalidate the security in favor of the banks, accepted in good faith, where a large proportion of the banks' shareholders are not shareholders in the shoe company; nor, can the further fact, that directors or stockholders of the shoe company were guarantors of any part of the indebtedness of that company to the banks impugn that security thus given, as the case is not thus within the rule against the preference of corporate indebtedness to a director. Rockford Wholesale Grocery Co. v. Standard Grocery & Meat Co., 175 Ill. 89, 93, 51 N. E. 642, 67 Am. St. Rep. 205; Sandford Fork & Tool Co. v. Howe, Brown & Co., supra. As held in Hollins v. Iron Co., 150 U. S. 371, 382, 14 Sup. Ct. 127, 37 L. Ed. 1113 (approved in Manufacturing Co. v. Hutchinson, supra), the doctrine is well settled in the federal courts "that the property of a private corporation is not burdened with any specific lien or direct trust in favor of general creditors" and prior to the Bankrupt Act of 1898 it was the established rule in Illinois that an insolvent corporation is at liberty to prefer creditors not officers of the company. Blair v. Steel Co., 159 Ill. 350, 364, 42 N. E. 895, 31 L. R. A. 269, and cases cited. In this judgment the writer of this opinion would concur were he able to see that the directors and stockholders of the bank receiving the security were at the time free from knowledge of the shoe company's true state of affairs.

I cannot, however, bring myself to see the facts, centering around the preference transaction, as the majority of the Court have seen them, and feel that it may be excusable to state my own conclusions in this respect.

July 1, 1892, the board of directors of the shoe company consisted of John J. Foote, Barnett Graff, John Hannah, E. L. Lawrence and D. D. Sabin. On this date Foote was a stockholder in both banks, and a director of the First National Bank; and Sabin was a stockholder, director and vice-president of the Second National Bank. Allen C. Fuller, a director of the shoe company from January 11, 1892, until March 8, 1892, was, during that period, and until after the failure of the company, the largest stockholder in both banks. Ezra May, director of the shoe company from February 13, 1891, until January 11, 1892, was, during this period, and on July 1, 1892, a stockholder and director in both banks, and president of the Second National Bank. All the stockholders in both banks were stockholders in the shoe company, at different times. Fuller was the holder approximately of twenty-two thousand dollars of the cap-

ital stock of the two banks, or a little less than one seventh. His subscription to the twenty-five thousand dollar increase stock was six thousand two hundred and fifty dollars, which, after deducting something over thirty-five hundred dollars paid to himself, left two thousand seven hundred and fifty dollars to go upon the payment of the debts—or a little over one ninth of the whole sum paid in as increase capital stock. Foote was the owner of thirty-eight hundred dollars of the capital stock of the two banks, or about one thirty-ninth, and his subscription to the increase capital stock was four hundred dollars, or about one sixtieth. Sabin was the holder of the stock of the two banks to the amount of two thousand one hundred dollars, or about one seventy-first thereof, and his subscription to the increase capital stock was one hundred dollars, or about one two hundred and fiftieth thereof. May was the holder of stock in the two banks to the amount of six thousand five hundred dollars, or about one twenty-third thereof, and his subscription to the increase capital stock was six hundred and seventy-five dollars, or about one thirty-seventh thereof. It is thus apparent that if the avails of the increase capital stock went to the banks to pay off the liability on the fictitious notes, each of these men, considering the notes as otherwise worthless, received from the subscription a benefit considerably greater than his contribution.

The testimony shows that the bond issue of fifty thousand dollars, and the avails of the twenty-five thousand dollars increase capital stock, (except the thirty-five hundred going to Fuller) went to the two banks, to lift the so-called customer's notes, and certain notes of the shoe company itself, then held by the banks; that, after March 25, 1892, the First National Bank discounted no further paper of the shoe company, and that, after June 5, 1892, the Second National Bank discounted no further paper of the company. It is not clear what business was done by the shoe company from July 1, 1892, until the failure in September. The question is whether these transactions show that on July 1, 1892, the appellees were apprised of the insolvency of the company, and took these steps—the execution of the mortgage and the increase of stock—to obtain for their banks an advantage over the other creditors.

The fact that the banks, largely owned by these officers, directors, and stockholders of the shoe company, were the beneficiaries of the mortgage, covering every species of the shoe company's property, is in my opinion a circumstance sufficient to put the court upon inquiry. "Courts of equity" say the Supreme Court, considering a transaction similar to this, (Richardson v. Green, 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516), "regard such personal transactions of a party in either of these positions, not perhaps with distrust, but with a large measure of watchful care; and unless satisfied by the proof that the transaction was entered into in good faith, with a view to the benefit of the company as well as of its creditors, and not solely with a view to his own benefit, they refuse to lend their aid to its enforcement." The circumstances of the transaction, in my opinion, put the burden of explanation, upon the appellees.

The explanation is that the rapidly increasing business of the shoe company made it desirable that the pending indebtedness to the banks should be liquidated, so that the banks could, in the future, carry the shoe company's current financial needs, including the discounting of customers' paper. This might be satisfactory, if it were not in conflict with the sequel. Either the shoe company had further financial needs, in which case, contrary to the explanation, the banks did not, in fact, come to its help, or, what seems more probable, the business of the shoe company was already collapsing, in which case, the explanation is shown to have been false. The explanation, indeed, is no explanation. It only intensifies the suspicion aroused by the circumstances of the transaction.

The judgment of the Circuit Judge, hearing the case below, and of the majority of this Court, seems to have been influenced by the fact that the stockholders and directors of the shoe company, at the time the mortgage was executed, subscribed and paid for the increased capital stock; and that this constituted satisfactory evidence that they did not then realize or suspect the failing condition of the shoe company. But this argument is shorn of its force, when it is remembered that the money thus going out of their pockets, as stockholders of the shoe company, came back, with increase, into their pockets, as stockholders of the banks; and that on the whole, not even taking into account the fifty thousand dollars bond transaction, that was wholly for the benefit of the bank, this transfer from one pocket to the other was to their financial advantage.

I cannot escape the conviction—looking at their conduct both preceding and following the transaction of July, 1892—that the parties above named, directors or stockholders of the bank, had reason to know at the time of the execution of the mortgage of July 1, 1892, that the shoe company was insolvent. I cannot bring myself to believe that the mortgage was given in good faith by a going concern to obtain financial assistance to keep the company upon its feet. It seems much more probable to me that the whole transaction was a device, in view of coming failure—a failure that came in fact without any further attempt to keep going—to enable the banks to obtain a preference in the distribution of the company's assets. Nor does the fact that Fuller and May, the chief stockholders in the First and Second National Banks, ceased to be directors of the shoe company in January, 1892, prevent the rule stated from applying. They continued directors and officers of the bank. Foote and Sabin, small stockholders and officers in the banks, were put upon the directory of the shoe company. The rule that creditors thus situated shall not be permitted to obtain a peculiar advantage to themselves over others goes to the core of the transaction, and is not intended to be defeated by a mere technical alignment of officers. I have no doubt, in view of this record, that Foote and Sabin, directors of the shoe company, were controlled in this transaction by Fuller and May, their associates and superior officers in the bank. Nor is this view changed by the fact that there were other stockholders of the bank. For the purposes of this transaction the men named were the representatives of the others.

In this view of the facts, this case is, in all material respects, similar to Manufacturing Co. v. Hutchinson, supra. In that case, the Hopper Lumber and Manufacturing Company, being insolvent, and having no purpose to further continue its business, executed a mortgage to the Sutton Manufacturing Company, covering its entire stock, and every article and thing used in its business, to secure the payment of drafts to the amount of eighteen thousand dollars, drawn at different times during the preceding two months by the Hopper Company upon the Sutton Company. Of the six hundred shares capital stock of the Hopper Company at the time of the mortgage, five hundred and ten shares were held by James S. Hopper, the president; thirty shares by Henry S. Hopper, secretary and treasurer, and a director; twenty shares by Fannie E. Hopper, a director; and forty shares by Elizabeth Sutton, mother of Fannie E., and mother-in-law of James S. Hopper.

Of the one thousand shares of the Sutton Manufacturing Company, one share was held by James S. Hopper; two hundred and fifty-nine shares by Fannie E. Hopper; one hundred and twenty shares by Henry S. Hopper; two hundred and four shares by Benjamin F. Sutton (a director in the Hopper Company); seventy-six shares by Mary J. Adams; one hundred and twenty shares by Walter A. Hopper; and two hundred and twenty shares by Elizabeth Sutton. Neither of the last three were officers or directors in the Hopper Company, and had no relation to the Hopper Company, other than that Mary J. Adams was his sister, and Elizabeth Sutton the mother, of Fannie E. Hopper, and Walter A. Hopper was the son of James S. Hopper by a former wife.

The court held the mortgage void, laying down the rule that when a corporation becomes insolvent, and does not expect to make further effort to accomplish the objects of its creation, its managing officers and directors came under a duty to distribute its property or its proceeds ratably among the creditors; and that, because of the existence of this duty, the law will not permit them, although creditors, to obtain any peculiar advantage for themselves to the prejudice of others.

Recognizing the fact that the mortgagee was a corporation, and not the individual directors, of the Hopper Company, and that some of its stockholders had no pecuniary relation with the Hopper Company, the rule is, notwithstanding, applied, because, as stated, two of the directors of the insolvent Hopper Company owned nearly four hundred shares out of the one thousand shares of the Sutton Company; wherefore, the mortgage had the effect to protect their interest, and to withdraw the property mortgaged from its primary liability for the debts of the mortgagor company. "The case presented" say the court "is consequently one in which an insolvent corporation, recognizing its inability to further prosecute its business, and with no hope of recovering from its financial embarrassments, gives a preference by mortgage of its property to some of its directors, being also creditors. According to the principles we have announced this could not be rightfully done."

The Illinois cases (Gottlieb v. Miller, 154 Ill. 44, 39 N. E. 992;

Blair v. Steel Co., 159 Ill. 350, 42 N. E. 895, 31 L. R. A. 269; State Nat. Bank of St. Joseph v. Union Nat. Bank of Chicago, 168 Ill. 519, 48 N. E. 82), in essence, are not in conflict with this ruling. In all these cases it is held that creditors of an insolvent corporation, who are, also, directors, can not secure preference of their claims, at the expense of other creditors; that in such a case, as distinguished from a case where the directors apply the assets of the insolvent corporation to the payment of a debt due a third person, there is a trust.

The mortgage, in my judgment, comes under the ruling of Manufacturing Co. v. Hutchinson, supra, and should, as to the complaining creditors, be declared void, and the estate should be administered according to that theory; but overruled in this particular phase of the case, as I am, by the judgment of my associates, the decree of the Circuit Court must be affirmed.