# SANFORD FORK AND TOOL COMPANY v. HOWE BROWN AND COMPANY, LIMITED.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 190. Argued January 23, 1895. — Decided March 28, 1895.

A corporation, acting in good faith and without any purpose of defrauding its creditors, but with the sole object of continuing a business which promises to be successful, may give a mortgage to directors who have lent their credit to it, in order to induce a continuance of that credit, and to obtain renewals of maturing paper at a time when the corporation, although it may not be then in fact possessed of assets equal at cash prices to its indebtedness, is in fact a going concern, and is intending and is expecting to continue in business.

Under the circumstances detailed in the statement of facts and in the opinion of the court in this case, it is *held,* that the mortgage given by the Sanford Fork and Tool Company, by special direction of its stockholders, to its directors to secure them for indorsing and for continuing to indorse the paper of the company, is valid.

THIS was a suit commenced in the Circuit Court of the United States for the District of Indiana by the appellees, creditors of the Sanford Fork & Tool Company, to set aside a mortgage given by such company to secure certain of the directors and stockholders of the company for indorsements made by them of the company's paper. No proofs were taken, and the case was disposed of on the bill and answer, and a decree entered in favor of the plaintiffs, adjudging such mortgage invalid as against them. The facts disclosed by the pleadings are as follows: The Sanford Fork & Tool Company was a corporation organized under the laws of the State of Indiana, doing business at the city of Terre Haute in that State. Its capital stock at first was one hundred thousand dollars, but was afterwards increased to one hundred and fifty thousand dollars. It commenced business in 1888 and continued as a going concern for about eighteen months and up to May 13, 1890, at which time it failed and its property passed

into the possession of one of the defendants, John W. Davis, as receiver. The plaintiffs were creditors of the company, whose claims all accrued prior to March 17, 1890, at which time the mortgage complained of was executed. The defendants McKeen, Hulman, Nixon, Minshall, Kidder, and Mayer were each stockholders, and the first five constituted the board of directors of the company. Early in its history, and on July 2, 1888, the company had executed a deed of trust to one Deming, as trustee, to secure an issue then made of $50,000 of its ten-year negotiable bonds. This trust deed conveyed as security the manufacturing plant of the corporation — a tract of about three acres in the city of Terre Haute, with the buildings and appurtenances.

Being a comparatively new enterprise the company, in addition to the means derived from its capital stock and its bonded indebtedness, required large sums of money to enable it to successfully carry on and develop its business, and to obtain this money it executed during the fall and winter of 1889–1890 and between September 18, 1889, and March 3, 1890, its ten promissory notes, amounting in the aggregate to the sum of sixty-nine thousand dollars, which notes were indorsed by the six parties named above as directors and stockholders, the notes being severally as follows:

1. Executed to the Terre Haute Savings Bank, for $5000, dated September 18, 1889, due in five months, and indorsed by McKeen, Hulman, Kidder and Nixon.

2. To the same bank, same date, due in six months, for the same amount and indorsed by the same parties.

3. Executed to Nixon, dated December 14, 1889, due March 15, 1890, for $15,000, indorsed by Nixon, Hulman, and Kidder, and held by the Vigo County National Bank.

4. Executed to Nixon, dated January 21, 1890, due in sixty days, for $5000, indorsed by Nixon, McKeen, Hulman, and Kidder, and held by the Terre Haute Savings Bank.

5. Executed to Minshall, dated January 21, 1890, due in thirty days, for $4000, indorsed by Minshall, Hulman, McKeen, and Kidder, and held by the First National Bank of Brazil.

6. Executed January 30, 1890, to Nixon, due in ninety days,

for $15,000, indorsed by Nixon, Kidder, McKeen, Mayer, and Hulman, and held by the Vigo County National Bank.

7. Executed February 5, 1890, to Nixon, due in sixty days, for $5000, and indorsed by Nixon, Minshall, McKeen, Hulman, and Kidder, and held by the Vigo County National Bank.

8. Executed February 2, 1890, to Nixon, due in thirty days, for $5000, indorsed by Nixon, Minshall, McKeen, Hulman, and Kidder, and held by the Vigo County National Bank.

9. Executed March 3, 1890, to Nixon, due in sixty days, for $5000, indorsed by Nixon, Kidder, Hulman, Minshall, and McKeen, and held by the Terre Haute Savings Bank.

10. Executed March 3, 1890, to the Terre Haute Savings Bank, due in sixty days, for $5000, indorsed by Nixon, Kidder, Hulman, Minshall, and McKeen.

All the money received from these notes was expended upon and went directly into the property and material of the Tool Company. At the time these directors and stockholders indorsed these notes the Tool Company was a going concern, in full operation, with property and means "amply sufficient to pay all of its indebtedness if its property was worth what it had cost in cash." They believed that such property was worth what it had cost in cash, that the corporation was "solvent and capable of becoming an independent and profitable manufacturing institution as soon as it could win its way to a favorable market for its manufactured products." As these notes thus indorsed began to mature the directors found that the company was unable to pay them, and required a renewal or an extension. Thereupon, on March 1, 1890, they called a special meeting of the stockholders, which was held on March 15. At this meeting, out of a total of three thousand shares, two thousand two hundred and fifty were represented, and a resolution was passed authorizing the directors to execute a mortgage or mortgages upon all or any part of the property of the corporation, to secure any new indebtedness that might be incurred, or the renewal and extension of any present indebtedness or liability of the corporation. Thereupon, the directors having taken suitable action, the mortgage in controversy was executed conveying to Buena V.

Marshall, as trustee, the property described in the trust deed hereinbefore referred to, to wit, the company's manufacturing plant, to indemnify the six indorsers for their indorsements of the notes, or renewals thereof, or on account of any moneys thereafter advanced by them. Relying upon such security the indorsers above named either paid or procured renewals of the several notes, and in addition two of them indorsed and subsequently paid other paper of the company to the amount of six thousand dollars. This mortgage was not recorded until May 1, 1890. At the time of its execution and delivery, as at the time of the indorsements hereinbefore mentioned, the company " was in full operation as a going concern," with ample means to pay its indebtedness, if the cash cost of its property could be obtained therefor. The indorsers believed that " the property was worth what it had cost in cash, and believed the corporation to be solvent," and in fact the corporation continued to be " a going concern, and carried on its business in the usual way, and met all its obligations (other than the notes embraced in the indemnity mortgage) as they matured in the usual course of business," until the appointment of a receiver on May 13, 1890, during which time it paid out for current expenses and maturing obligations thirty thousand dollars or over. The indorsers " believed that it was only necessary to tide the corporation over a temporary embarrassment until it could succeed in establishing a favorable footing in the market for the sale of its manufactured products." They accepted the indemnity mortgage in good faith, with knowledge that all the money obtained by means of the notes upon which they had become liable as indorsers had been properly appropriated to and gone into the property and material of the company.

At the date of the execution of this mortgage the Tool Company was indebted in the sum of two hundred and seventy-five thousand dollars. The value of its property at that time does not appear, but after the appointment of a receiver it was appraised, the manufacturing plant — the property described in the trust deed and mortgage — being appraised at $116,055.39; the other and unencumbered property at $88,390.85.

*Mr. George A. Knight,* (with whom was *Mr. John A. Butler* on the brief,) for appellants.

*Mr. Sydney B. Davis,* (with whom were *Mr. Cyrus F. McNutt, Mr. J. G. McNutt, Mr. F. A. McNutt, Mr. S. M. Reynolds,* and *Mr. George M. Davis* on the brief,) for appellees.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

In the absence of any testimony, and in the manner in which this case was submitted for decision, it must be assumed that the matters alleged in the bill and not denied in the answer and the new matters set forth in the answer are true. And the question which arises is whether, upon these admitted facts, the decree in favor of the plaintiffs can be sustained.

The manufacturing business in which the corporation was engaged was a new enterprise. It had been carried on for only about eighteen months. In that business had been invested nearly $300,000, and the property possessed by the corporation was at its cost price equal to the entire indebtedness. It thus appears that there had been no waste, mismanagement, or loss. Not a dollar of the indebtedness was held by any director or stockholder, but the personal credit of the six directors and stockholders had been loaned to the company to the extent of $69,000. The corporation was still a going concern. There was no purpose of abandoning the business. The indorsers believed that if the corporation could be tided over its temporary embarrassment it could be made successful. The stockholders authorized the mortgage. It was given only upon part of the property, and that part already encumbered by a fifty thousand dollar trust deed. The value of this property was, according to the subsequent appraisement, much below the sums secured by the trust deed and the mortgage. In addition the corporation had nearly $90,000 of unencumbered property to apply in satisfaction of the claims of its creditors. The mortgage was not given simply as security for a past indebtedness, but to induce the

indorsers to obtain for the corporation a renewal or extension of its obligations, and to make further indorsements. In reliance upon this mortgage the indorsers secured renewals or extensions, or themselves took up the notes they had indorsed, and at the same time lent the credit of their names to new paper of the company. Thus they prevented a suspension of the business and enabled the corporation to continue its operations, and did so believing that by such continuance the corporation would be enabled to work itself out of its temporary difficulties. All this was done in the utmost good faith.

Under these circumstances, should the transaction be condemned and the mortgage held void as against creditors? This question, we think, must be answered in the negative. It is said that the directors of a corporation stand in a fiduciary relation to both the stockholders and the creditors. Whatever may be the extent of the fiduciary obligations of directors to stockholders, there can be no pretence in this case of a breach thereof. The mortgage was expressly authorized by the stockholders, and they cannot claim that the directors in executing the instrument, which they had themselves authorized, were guilty of any breach of duty to them. It is often said that the directors may not take advantage of their position and power to secure personal advantage to themselves, but that proposition has no application here, for the corporation itself directed this mortgage. It was an application by the debtor of its property to secure certain of its creditors, and not the act of the agents of a debtor to protect themselves. The case involves no breach of trust on the part of the agent towards the principal, but more closely resembles the case of an individual debtor giving preferences to certain of his friends, and the general rule is that, in the absence of statute, a debtor has such *jus disponendi* in respect to his property that, although insolvent and contemplating a cessation of business and the surrender of his property to his creditors, he may lawfully prefer certain of them, even though thereby others receive no payment.

But, passing from the relations of directors to the corpo-

ration and its stockholders, it is one of the vexed questions of
the law as to how far the duty of a corporation and its direc-
tors to creditors interferes with the otherwise conceded power
of a debtor to prefer certain of his creditors. Into a discus-
sion of this question in its length and breadth we deem it
unnecessary now to enter, for the facts of this case remove
many of the embarrassments that often attend such questions.
This is not like the case of *Sutton Manufacturing Co.* v.
*Hutchinson*, 63 Fed. Rep. 496, decided by the United States
Court of Appeals for the Seventh Circuit, in which the direc-
tors of a corporation, insolvent and intending to discontinue
business, gave a mortgage to secure certain of their number
who happened to be creditors, and thus attempted to secure
a preference in behalf of themselves. Nor is it the case of
the directors of a corporation in fact insolvent, though con-
tinuing and expecting to continue in business, executing a
mortgage on the property of the corporation to simply secure
themselves for a past indebtedness; for here the corporation,
although insolvent within the rule which declares that insol-
vency exists when a debtor has not property sufficient to pay
his debts, was still a going concern and intending to continue
its business, and the mortgage was executed not simply to
secure directors and stockholders for past indebtedness but
to induce them to procure a renewal or extension of paper of
the company then maturing or about to mature, and also
to obtain further advances of credit.

Will it be doubted that, if this mortgage had been given
directly to the holders of these notes, it would have been
valid? Are creditors who are neither stockholders nor direc-
tors, but strangers to a corporation, disabled from taking
security from the corporation by reason of the fact that upon
the paper they hold there is also the indorsement of certain
of the directors or stockholders? Must, as a matter of law,
such creditors be content to share equally with the other
creditors of the corporation, because, forsooth, they have
also the guarantee of some of the directors or stockholders,
whose guarantee may or may not be worth anything?

But even that is not this case, for here the corporation was

a going concern and intending to continue in business, and the mortgage was given with a view of enabling it to so continue, and to prevent creditors whose debts were maturing from invoking the aid of the courts to put a stop thereto. Can it be that, if at any given time in the history of a corporation engaged in business, the market value of its property is in fact less than the amount of its indebtedness, the directors, no matter what they believe as to such value, or what their expectations as to the success of the business, act at their own peril in taking to themselves indemnity for the further use of their credit in behalf of the corporation? Is it a duty resting upon them to immediately stop business and close up the affairs of the corporation? Surely, a doctrine like that would stand in the way of the development of almost any new enterprise. It is a familiar fact that in the early days of any manufacturing establishment, and before its business has become fully developed, the value of the plant is less than the amount of money which it has cost, and if the directors cannot indemnify themselves for the continued use of their personal credit for the benefit of the corporation, many such enterprises must stop in their very beginning.

It is worthy of note, too, that these directors placed the encumbrance not on the entire property of the corporation, but only upon that part which ordinarily shows the greatest difference between value and cost, to wit, the building and the machinery — property, too, which was already encumbered for a large sum, leaving free all the unencumbered property of the corporation to answer to the claims of creditors.

Of course, an underlying fact, expressly stated to have existed in these transactions, is good faith. Carrying on business after the giving of an indemnifying mortgage, with a knowledge of insolvency, with the expectation of soon winding up the affairs of the corporation, and only for the sake of giving an appearance of good faith, leaves the transaction precisely as though the mortgage was executed at the moment of distribution, and with the view of a personal preference.

Again, not only was the corporation a going concern, not only did the directors expect and intend that it should continue, and believe that its continuance would bring financial success, but, as appears, they did continue the business for two months, and during that time paid out in the ordinary management of its affairs and in discharge of its debts over $30,000, without appropriating a single dollar to the payment of the claims for the indorsement of which they had taken this indemnity.

We are of opinion that these facts clearly and fully distinguish this case from many which have been cited, in which the action of the directors of a corporation in securing to themselves preferences in the hour of its extremities has been adjudged void, and that it is going too far to hold that a corporation may not give a mortgage to its directors who have lent their credit to it, to induce a continuance of the loan of that credit, and obtain renewals of maturing paper at a time when the corporation, though not in fact possessed of assets equal to its indebtedness, is a going concern, and is intending and expecting to continue in business. We are, therefore, of opinion that the Circuit Court erred, and the decree will be

*Reversed and the case remanded for further proceedings not inconsistent with this opinion.*