## In re FEDERAL COAL CO.

District Court, E. D. Kentucky. August 29, 1927.

N. R. Patterson, of Pineville, Ky., for petitioners.

Chas. C. Moore, of Chattanooga, Tenn., for respondent.

COCHRAN, District Judge. This proceeding is before me on petitions for review filed by the Hamilton National Bank, the Hamilton Trust & Savings Bank, and the Lookout Coal Company complaining of an order of the referee disallowing as secured claims certain mortgage bonds executed by the bankrupt and held by the petitioners. The bonds so disallowed were part of an issue of $275,000, made September 22, 1924, secured by a mortgage of that date on the property of the bankrupt. The execution of the bonds and mortgage was authorized, first at a meeting of the stockholders and then at a meeting of the directors, both held on that day.

The bankrupt was the owner and operator of coal-mining property in Bell county, in this district. It had acquired same before 1920 in the division of the properties of the Continental Coal Corporation, whose affairs had been wound up in this court in litigation between the Chattanooga interest and the Louisville interest. The property which it had was that acquired by the Chattanooga interest. Creditors of the Continental Coal Corporation, who made up or cast their lots with it, took stock in the bankrupt for their

debts. Its capital stock outstanding amounted to $1,345,607. A large majority of the stock was held by T. R. Preston, president of the bankrupt, and of the Hamilton National Bank and the Hamilton Trust & Savings Bank, and his kinspeople and others interested in or connected with one or both of the two banks. The bankrupt had seven directors. He and his brother, his personal attorney and attorney of the two banks and of the bankrupt, and an officer of the two banks, were members of the board and constituted the majority thereof. Through this ownership of stock and director membership T. R. Preston had absolute control of the bankrupt. He could have it do whatever he wanted it to do. It is not unlikely that his position with the two banks was the same. Likewise the other petitioner, the Lookout Coal Company, was a Preston concern.

Before the slump in 1920, seemingly, the bankrupt was free from debt. That slump seriously affected its financial condition. To meet its liabilities the petitioners loaned the bankrupt large sums of money, and Mr. Preston, seemingly possessed of large means, indorsed all the paper given by the bankrupt to the two banks. On December 27, 1921, the bankrupt executed and delivered to him a mortgage upon its property to indemnify him from loss by reason of such suretyship to the extent of $150,000. This mortgage was not recorded. On September 22, 1924, the date of the stockholders' and directors' meetings heretofore referred to, the petitioner the Hamilton National Bank held notes of the bankrupt for $167,000, all indorsed by Preston; the petitioner the Hamilton Trust & Savings Bank held its notes for $70,000, all so indorsed; the petitioner the Lookout Coal Company held its notes for $35,000, also so indorsed; and Preston and his brother held its notes for $15,000. All these notes were given for money loaned to the bankrupt. They amounted altogether to the sum of $287,000. The bills payable outstanding amounted to $322,755.34, or only the sum of $35,755.34 over and above what were held by the petitioners and the two Prestons, and it is not unlikely that T. R. Preston was personally bound for some, if not most, of this. In the bankrupt's financial difficulties, brought upon it by the slump of 1920, which wrought such financial havoc throughout the country, he came to the bankrupt's rescue and gave it his influence, credit, and cash without stint.

Such was the condition of things when the stockholders' and directors' meetings were held on September 22, 1924. At the stock-

holders' meeting there was represented 9,039 shares, of which 8,525 shares were held by Preston and his coterie. He stated to the meeting that "the amount of bills payable is being carried by the company at banking rates of interest, and it was considered very much to the interest of the company to fund by the proposed bond issue $275,000 of this floating indebtedness, leaving the remainder to be paid out of the amount to be realized from the receivables." Thereupon a resolution was unanimously adopted, authorizing and directing the board of directors to issue bonds to the amount of $275,000, secured by mortgage, a draft of which was submitted to the meeting. It contained a provision that the bonds, when certified by the trustee, should be delivered to the president. At the meeting of the board of directors, five directors were present, and such issuance was authorized and directed. So far as the minutes of these two meetings indicate, what was contemplated was that these bonds should be sold and the proceeds used in paying the floating indebtedness to their extent. Thereupon the bonds were issued, certified by the trustee, and delivered to Preston as president.

It was soon found that the bonds were not salable, or only at such a discount that it would not be advisable to sell them. Thereupon Preston disposed of the bonds in this way. He delivered to himself and brother $15,000 in payment of their debts, and to the petitioner Hamilton Trust & Savings Bank $15,000 in payment of that much of its debt, leaving $55,000 unpaid. The remaining bonds he pledged as collateral security—$155,000. of them—to the Hamilton National Bank to secure $117,000 of its debt, leaving $50,000 unpaid and unsecured; $55,000 to the petitioner Hamilton Trust & Savings Bank, to secure its debt of $55,000; and $35,000 to the petitioner the Lookout Coal Company, to secure its debt of $35,000. The two banks surrendered the notes personally indorsed by Preston, and accepted in their stead the notes of the bankrupt thus secured. Though thereby Preston was legally released from liability on his paper, he seems to regard himself as morally bound to see that the two banks do not lose any money by these transactions. The petitioners filed their claims thus secured, and it is this security which the referee disallowed. The ground upon which he disallows it was that Preston had no authority to pledge the bonds as collateral security. The trustee urges as an additional ground for invalidating the pledge that it was in violation of section 1906, Kentucky Statutes.

The principal ground upon which it is urged that Mr. Preston had no authority to pledge these bonds as collateral security for the indebtedness of the bankrupt is that it was a diversion from the purpose for which their issuance was authorized. They were authorized for the purpose of being sold, and not for the purpose of being so pledged. It is true that they were authorized for that purpose, but it was only in case they could be sold. It takes two to make a bargain, and they could not be sold, unless a purchaser could be found. A purchaser could not be found, except at what was thought to be a sacrifice, and possibly not even on that basis. There was, therefore, no diversion in any true sense of the word. The purpose of their authorization was not carried out, simply because it could not be, and for no other reason. The inability to sell them left the bonds on hand, and this presents the question whether Mr. Preston had the authority to make the disposition of these unsalable bonds which he made. It does not dispose of the question that as president he had no inherent power to do so.

It often happens—more generally than otherwise—that the president of a corporation has more power than his inherent power. The by-laws provided that: "The president shall be the chief executive officer of the company. He will preside at all meetings and shall have general and active management of the business of the company." In 3 Fletcher on Corporations, p. 3276, it is said: "A general manager without any limitations or restrictions as to his express authority has implied authority, it has been said, 'to do anything that the corporation could lawfully do in the general scope of its business.'"

Now the most important business which the bankrupt then had on hand was its finances. Its indebtedness was almost exclusively due to banks on short time paper, all of which it would seem had Mr. Preston's personal indorsement. It would all become due in 90 days at the farthest, and some of it in a very few days. The purpose of the bonds was to satisfy this indebtedness to the extent of what could be realized from their sale. It must have been contemplated that possibly they could not be sold to advantage, at least, at that time, and that it might be necessary to pledge them as collateral, in order to secure renewal of the paper as it became due. Preston was then secured by an unrecorded mortgage to the extent of $150,000, which mortgage he could put to record at any time. The trustee in the mortgage was directed to certify the bonds as soon as it was executed, without

waiting for its recordation, and deliver them to Preston, the president. I have no hesitancy in holding that these facts of themselves were sufficient alone to empower him to pledge them as he did.

But express authority was conferred on him at both the stockholders' and directors' meetings to make such disposition of them. This is testified to by three of the directors, who were present at the meeting, and it is what one would expect. It is unimportant that no note of this appears in the minutes. In 3 Fletcher on Corporations, p. 3090, it is said: "In order to confer authority on persons to bind the corporations it is not necessary that there be a writing or a vote or resolution of the board of directors or trustees. A special resolution of the board of directors is not necessary to authorize a corporation officer to act for it, but he may be authorized to act by parol and proof of his authority may be shown by parol. No formality is required to confer authority upon an officer of the board of directors. * * * It is immaterial that the minute books of the corporation show no authority on the part of the president to enter into a contract; and the failure to preserve in the minutes or other writing the evidence of a corporation's act conferring authority upon its agent to borrow money would not invalidate the evidence of a corporation's act conferring authority upon its agent to borrow money would not invalidate authority conferred." So far as the decision in the case of Bastin v. Givens, 170 Ky. 201, 185 S. W. 835, holds otherwise, it is not sound.

Counsel for the trustee goes back of the question of the authority to Preston to the authority of the bankrupt to make the pledge, citing the cases of Sutton Mfg. Co. v. Hutchinson (C. C. A.) 63 F. 496; Sanborn-Cutting Co. v. Paine (C. C. A.) 244 F. 672. But those cases have no application here. They hold that an insolvent corporation, on the eve of ceasing business, has no authority to prefer one creditor of a corporation over another, particularly so if the creditors are officers of the corporation who give the preference.

The pith of the decision may be found in this statement in the opinion: "It is quite true that the property of a private corporation is not charged by law with any direct trust or specific lien in favor of general creditors; and such a corporation, so long as it is in the active exercise of its functions, may, if not restrained by its charter or by statute, exercise as full dominion and control over its property, having due regard to the objects of its creation, as an individual may exercise over his property. But when it becomes insolvent, and has no purpose of continuing business, the power to sell, dispose of, and transfer its estate is not altogether without limitation."

And this: "It is, we think, the result of the cases that when a private corporation is dissolved or becomes insolvent, and determines to discontinue the prosecution of business, its property is thereafter affected by an equitable lien or trust for the benefit of creditors. The duty in such cases of preserving it for creditors rests upon the directors or officers to whom has been committed the authority to control and manage its affairs. Although such directors and officers are not technical trustees, they hold, in respect of the property under their control, a fiduciary relation to creditors; and necessarily, in the disposition of the property of an insolvent corporation, all creditors are equal in right unless preference or priority has been legally given by statute or by the act of the corporation to particular creditors."

In this case there is no evidence that, at the time of the pledges complained of, the bankrupt was insolvent. It was not so regarded by its principal owners, who were handling its affairs. It certainly had no purpose to cease business. On the contrary, its purpose was to continue business. It was to this end that the pledges were made. The case is covered by the decision in the case of Gould v. Little Rock, M. R. & T. Railroad Co. (C. C.) 52 F. 680.

Concerning this case it was said in the case just considered (page 504 of 63 F.) as follows: "That case involved, among other things, the validity, as against the creditors of a railroad corporation, of a deed of trust executed as additional security to certain stockholders and directors who had previously advanced large sums for it, and for the repayment of which the company pledged as collateral security mortgage bonds known at the time to be inadequate as security. But it was the best security the company could then give. Subsequently it obtained a grant of lands from the state, and at a later date, 1884, the above deed of trust was given to secure the above loans or advances. Now, the company, when it made the deed of trust, had not abandoned, and did not intend to abandon, the prosecution of its business. Nor was it hopelessly insolvent. On the contrary, it appeared, and the fact is stated in the report of the case, that 'at the date of the execution of the deed of trust the floating debt of the Company was inconsiderable, and the Company continued to be a going concern,

and to own its road, until it was sold in 1887 under a decree foreclosing the mortgage given to secure its first mortgage bonds.'"

It is also covered by the case of Sanford Fork & Tool Co. v. Howe, Brown & Co., 157 U. S. 312, 15 S. Ct. 621, 39 L. Ed. 713. It was there held that a corporation may give a mortgage to its directors, who have lent their credit to it, to induce a continuation of the loan of that credit and obtain renewals of maturing paper at a time when the corporation, though not in fact possessed of assets equal to its indebtedness, is a going concern and is intending and expecting to continue in business.

It remains to consider the contention that the transactions were in violation of section 1906 of Kentucky Statutes. Such is not the case. They were not fraudulent transfers within the meaning of that section. They were pledges to secure an existing debt. It is well settled that such a transfer is not fraudulent. In the case of Sutton Mfg. Co. v. Hutchinson, supra, in reference to a similar statute of Indiana, it was said: "The Indiana statute does not cover the whole subject of the conveyance or transfer of property in violation of the rights of others. It does not embrace every case of an insolvent private corporation which mortgages its property to secure an antecedent debt due to one of its directors. The statute was aimed at conveyances or assignments of property made with the intent to hinder, delay, or defraud creditors or other persons of their lawful rights or demands. A mortgage made in good faith, without intent to hinder, delay, or defraud other creditors, but for the sole purpose of preferring a particular creditor, is not prohibited. The statute does not take away the right to give such a preference where it could be lawfully done according to the principles of the common law. It leaves the question of the validity of a conveyance not made with the forbidden intent, but simply for the purpose of preferring a particular creditor, to be solved by any general, recognized principles that are applicable to such a case."

Here there is not the slightest room to doubt the entire good faith of these pledges. The outlook of the bankrupt, it is true, was not very rosy, but its case was not looked upon as hopeless. It had a very large claim which it was asserting in New York. As to the suits which were pending against it, it looked upon them as based on unfounded claims. The disaster which came upon it seems to have been due to all the suits in which it was then and subsequently became engaged terminating adversely to it.

I am constrained to hold that the order of the referee be reversed, and that the proceedings be remanded to him for further steps consistent herewith.