## CORY v. HAMILTON NAT. BANK, et al.

Circuit Court of Appeals. Sixth Circuit.
February 15, 1929.

No. 5090.

T. K. Helm and Thos. J. Wood, both of Louisville, Ky. (Allison, Lynch & Phillips, of Chattanooga, Tenn., Trabue, Doolan, Helm & Helm, of Louisville, Ky., on the brief), for appellant.

Charles C. Moore, of Chattanooga, Tenn., for appellees.

Before MOORMAN, MACK, and HICKENLOOPER, Circuit Judges.

MACK, Circuit Judge. Appeal from an order reversing an order of the referee in bankruptcy and directing the allowance of the claims of appellees as secured creditors. The Federal Coal Company was adjudicated a voluntary bankrupt on August 29, 1925. Its schedules filed with the petition listed appellees as secured creditors. The schedule of unsecured creditors is not in the record, and there is no other evidence supporting either appellant's statement, that there were 24 such creditors, or appellees', that T. R.

Preston personally has satisfied the claim of every creditor except Cory and Flanagan.

Cory, in the name of the trustee in bankruptcy, objected to the allowance of appellees' claims as secured by a trust deed on the grounds: (1) That the pledge by Preston of the bonds so secured was an unauthorized diversion thereof from the purpose for which they had been issued; and (2) that the trust deed itself was void under the common law and Kentucky statutes as a fraudulent conveyance. The referee held for appellant on the former ground. On petition to review, the District Court made the order herein appealed from, dated September 17, 1927. The opinion, handed down on August 29, 1927, held that Preston had had implied authority by virtue of his office of president to pledge the bonds, but that in any event his act had been sufficiently authorized by the unexpressed understanding at the corporate meetings; further that there was no question of fraud, because there was neither insolvency at the time of the trust deed nor bad faith. The opinion concluded: "I am constrained to hold that the order of the referee be reversed and that the proceedings be remanded to him for further steps consistent herewith." The appeal was taken on October 14th.

Appellees make the preliminary contention that there is no jurisdiction to hear this appeal because it was not taken within 30 days from August 29th, the date on which they contend "the judgment" in the *proceedings* in bankruptcy was "rendered." Bankruptcy Act, § 25a, 11 USCA § 48.

Appellant urges that, as only the lien is contested, section 24a, which permits an appeal from a judgment in a *controversy* arising in a bankruptcy proceeding, governs, and that under this clause appeal may be taken within "thirty days after the judgment * * * has been rendered *or entered.*" Neither contention, however, is relevant. The judgment appealed from was rendered September 17th, not August 29th. The quoted language from the opinion was not a judgment, but merely the basis for a judgment thereafter to be entered. In re McCall, 145 F. 898 (C. C. A. 6), is plainly distinguishable, in that there the judge had originally signed a formal order. Appellees' further contention that the record herein was filed too late under the rules of this court is without merit.

We proceed, then, to a statement of the facts out of which the controversy arose. T. R. Preston, bankrupt's president since its organization, owned or controlled nearly three-quarters of its capital stock. His

brother, C. M. Preston, his attorney, C. C. Moore, his private secretary, Mrs. N. C. Parker, and A. L. Underwood, were four of the other five directors. The two Prestons and Underwood were officers of and dominant in appellee banks; C. M. Preston was president of the other appellee. Bankrupt, after sustaining very heavy losses from coal brokerage speculation in 1920, became a large borrower in the hope of continuing in business. On December 12, 1921, bankrupt mortgaged its coal lands to T. R. Preston as security, both for indorsements theretofore made by him of its notes aggregating $54,500, payable to appellees and nine other banks, and for indorsements which he then promised to make on notes to be issued during 1922 in an amount not exceeding $150,000. Thereafter bankrupt continued to borrow heavily, mainly from appellees on short term notes indorsed by T. R. Preston. By September, 1924, the indebtedness amounted to $322,755.24. The record does not show how much of this had been contracted during 1922. Bankrupt had found it necessary to lease practically all of its productive lands, taking notes at the beginning of the year and immediately discounting them. Apparently none of its creditors were pressing it for payment.

On September 22, 1924, at a stockholders' meeting, T. R. Preston told of the large indebtedness, the high rate of interest being paid, and the probability that not more than $50,000 could be realized from the accounts receivable. The minutes state that "it was considered very much to the interest of the company to fund by * * * (a) bond issue $275,000 of this floating indebtedness leaving the remainder to be paid out of the amount to be realized from the receivables." The stockholders thereupon authorized a first mortgage upon the corporate property securing an issue in the amount of $275,000 of twenty year six per cent. bonds. Under the resolution, the board of directors was authorized "to cause to be executed, issued, and delivered for, and on behalf of the Federal Coal Company the * * * bonds," as well as "to do, on behalf of the Federal Coal Company, every act and thing that may be necessary or proper to carry into effect these resolutions."

On the same day, a directors' meeting attended by the above-mentioned five directors also authorized the bonds and mortgage. Moore testified that, although he had not thought it necessary in drawing up the minutes of the meeting to record the fact, the directors had considered the possibility of disposing of the bonds, and had reached an understanding that such of the bonds as could not be sold should be used as collateral to secure renewals on existing notes. Mrs. Parker corroborated Moore. This testimony was not contradicted. The trust deed and bonds were immediately executed; the former provided that a certificate indorsed on each bond by the trustee should be "conclusive and the only evidence that the bond upon which it is so indorsed is duly issued hereunder and entitled to the benefit and security of this Indenture." Such a certificate was indorsed on all of the bonds.

After inquiries made by Preston in the business community, not, however, supplemented by any determined effort to enlist the services of brokers, he apparently became convinced that the bonds could not be marketed, except at an oppressive discount. The only ones disposed of, $30,000 worth taken by the Prestons and one of the appellees, are not involved in this appeal. Within one to two months of the issuance of the bonds, Preston, without any further consultation with stockholders or directors, pledged the bonds as security for the notes then held by the three appellees. Either contemporaneously therewith, or when the notes fell due soon thereafter, Preston was released from his indorsement by appellees, and the 1921 mortgage held by him, which had never been recorded, was canceled. The notes were renewed, some at a lower rate of interest. The corporate by-laws provided that "the president shall be the chief executive officer of the company * * * and shall have general and active management of the business of the company."

In September, 1924, bankrupt had the following unliquidated or contingent liabilities: The Tennessee chancery court had determined that the Federal Company was liable to one Cory for breach of contract, and that he was liable to it on a counterclaim. The suit had been referred to a master to ascertain the amount of damages; in 1925, these were fixed at $13,576.50 against bankrupt. Another action brought by one Flanagan had been decided in favor of bankrupt by the Supreme Court of Tennessee, but on writ of certiorari the judgment was reversed in 1925 by the United States Supreme Court. Thereafter the state court held Flanagan entitled to recover. While the amount will approximate $40,000, it has not yet been definitely fixed. A third suit had been brought by the Liberty Coal & Coke Company in the United States District Court for $150,000 damages; subsequent to 1924, bankrupt was successful therein, in the trial and appellate courts. Appellant's statement

in his brief that bankrupt's tangible property was subject to liens for *additional* liabilities of $82,500 is not supported by the record.

The only evidence offered as bearing on the 1924 value of bankrupt's tangible. property is the price paid at the trustee's auction sale late in 1925, $190,000 slightly over 75 per cent. of the appraised value. This was paid by a credit to that amount on bankrupt's bonds. In addition to the tangibles and accounts receivable, the bankrupt had a claim against a bank for $600,000, on which it had brought suit. While nothing was ultimately realized thereon, Moore testified that, if the special counsel had properly handled the case, $75,000 would have been recovered.

In our judgment, the facts as above stated wholly fail to establish either actual fraud in the making of the mortgage and pledge, or constructive fraud by reason of insolvency at the time. Appellant offered no substantial evidence of the value of the tangibles in 1924 as part of a going concern; but, even if his valuation of $385,000 were accepted, the liabilities were but $322,755.24. Possible liabilities growing out of the claims then in suit were well offset by the then reasonably probable recovery in the other action; moreover, in one litigation there was a valid counterclaim, and in another temporary success, while in the third bankrupt ultimately prevailed. In the light of these circumstances, it cannot be inferred that the mortgage was executed with actual intent to defraud the claimants in the event of their recovery in the then pending suits. Such circumstances as may be considered "badges of fraud" under Kentucky law (Magic City Coal & Feed Co. v. Lewis, 164 Ky. 454, 175 S. W. 992; Griggs v. Crane's Trustee, 179 Ky. 48, 200 S. W. 317) are moreover satisfactorily explained. Preston was under no obligation to lend his credit indefinitely by renewing his indorsement of the short term notes. His refusal so to do would doubtless have precipitated creditors' proceedings in equity, if not in bankruptcy, against the corporation.

█ There was a reasonable expectation, which was in fact realized for over a' year, that the business could be tided through its difficulties, if it funded its debt over a long period, or even if it obtained some extension of credit. Preston's control of the debtor and creditors does not change what at least appeared to be a well-warranted business transaction into a fraudulent one. Without regard to the four-months bankruptcy limitation, an insolvent corporation, knowing that it cannot prosecute its business, and without

hope of recovering from its financial embarrassments, cannot give security to a director for a pre-existing debt by way of preference. Sutton Mfg. Co. v. Hutchinson (C. C. A.) 63 F. 496. But in the absence of these circumstances, and also of intent thereby to defraud or delay its other creditors, the corporation may lawfully, subject, however, to the four-months bankruptcy limitation, secure a director on such a debt, even though in the end it does thereby effectuate a preference. Sanford Fork & Tool Co. v. Howe, Brown & Co., 157 U. S. 312, 15 S. Ct. 621, 39 L. Ed. 713. See Fifth Third National Bank v. Johnson, 219 F. 89, 93 (C. C. A. 6). We have not relied upon appellees' further arguments based on the 1921 mortgage. In view of the conclusions reached by us, and of the uncertainty on this record as to whether or not the 1921 mortgage covered the particular indorsements on which Preston was released in 1924, we have not deemed it necessary to consider the effect of his release of this unrecorded mortgage.

█ There remains the objection that Preston had no authority to pledge the bonds for an antecedent indebtedness, in view of the express direction that they be used to fund the corporate debt. To fund an indebtedness connotes ordinarily the conversion of a heterogeneous floating indebtedness into a long term obligation. But, in our judgment, the expression was not used in its strict technical sense; clearly the entire indebtedness was not to be converted into a single obligation, for the debts exceeded the authorized bond issue by over $45,000. The primary purpose was to obtain a better interest rate and an extension. This Preston in effect did. The stockholders' resolution, moreover, did not place any limitation on the use of the bonds, other than that they were to be "executed, issued, and *delivered* for and on behalf of the Federal Coal Company." Compare Union Trust Co. v. Electric Park Amusement Co., 163 Mich. 687, 130 N. W. 306. The minutes of the directors' meeting likewise do not show any express requirement that the bonds be sold. The undisputed testimony is that the directors at their meeting expressed the intent that the bonds should be pledged if they could not be sold; parol evidence to this effect was properly admitted. United States Bank v. Dandridge, 12 Wheat. 64, 6 L. Ed. 552; Denver & R. G. R. Co. v. Arizona & C. R. ·Co., 233 U. S. 601, 34 S. Ct. 691, 58 L. Ed. 1111, Norma Mining Co. v. Mackay (C. C. A.) 241 F. 640. The views expressed in Bastin v. Givens, 170 Ky. 201, 185 S. W. 835, and Star Mills v. Bailey, 140

Ky. 194, 130 S. W. 1077, 140 Am. St. Rep. 370, are not only not controlling upon this court, but are distinguishable; the former involved expressions of individual directors, not in meeting assembled; the latter, so far as applicable, is a dictum.

Moreover the pledge of Preston, if not authorized in advance, was ratified thereafter when the corporation with knowledge of the transactions accepted the benefit of renewals extended upon the sole security of the pledged bonds, and continuously recognized the validity of the pledges, even as late as the filing of the schedules in bankruptcy. Prentiss Tool & Supply Co. v. Godchaux (C. C. A.) 66 F. 234. In these circumstances, it is unnecessary to determine whether or not appellees would be chargeable with the knowledge of Preston, the common president, if there had been lack of power to pledge the bonds.

Order affirmed.