BRUNOT, J.
 

 The transactions which resulted in this suit are accurately stated in the opinion of the learned district judge, from which we quote the following:
 

 “In June, 1922, at a foreclosure sale provoked by itself, the Peoples Bank & Trust Go., acquired five plantations equipped with a refinery and appurtenant railroad tracks, rights of way, rolling stock, boats, barges, and the usual paraphernalia of teams, implements, etc., subject to a prior mortgage of ninety-five thousand dollars and accrued interest from Jan. 5, 1922, at the rate of 6% per annum.
 

 “On September 16, it sold the same property to the Peoples Sugar Co., burdened with the same mortgage, for $276,009.90, to be paid in one year at 6% per annum interest, taking a vendor’s noté, secured by the vendor’s privilege and special mortgage, therefor.
 

 “The price represented the amount the bank ‘was out’ by way of previous advances on the property. * * * The purchaser had a capital of fifty thousand dollars, subscribed and held chiefly by directors and officers of the bank. These, also had a decided majority voice on the purchasing directory. Their secretary was the active vice president of the bank.
 

 “With the knowledge and approval of the bank, a selling contract was confected *
 
 *■
 
 * for the disposal of all of the land, except that occupied by the refinery site (some 99 acres) and the railroad rights of way, covering some twenty-odd acres. * * * During the next several years, some 1800 acres of the land was sold for the net value of $151,605.00, less some small expense, and accounted for to the bank, as per the contract.
 

 “During the same period the bank paid, and took subrogations on the property, for taxes, to the amount of some thirty-odd thousand dollars. * * * In the years 1924 and 25, the bank, in order to facilitate its debtor’s agricultural operations, had subrogated in favor of the advancer of money and supplies, its vendor’s rights against the teams, implements and other enumerated assets, not including, however, its rights against the land, refinery and site, railroad and rights of way, etc.
 

 “On June 24, 1926, the bank adopted a resolution authorizing its vice-president, in order to facilitate the Sugar Co., in financing its crop of 1926, to subordinate the bank’s rights, as mortgage holder, on certain designated assets, in favor of a mortgage to be given to the advancer of the amount of $85,-000.00.
 

 “On July 13, 1926, the Peoples Sugar Co. executed in favor of Thibodaux, Trustee, a crop lien and privilege, chattel mortgage and special mortgage secured, besides other items, by the refinery and factory site, railroad, rights of way, etc., for advances in the amount of $85,000.00; and, the designated agent of the bank appeared and, as per said resolution, subordinated, in favor of the mortgage recited, the bank’s existing prior rights there against.
 

 
 *974
 
 “At the end of 1926, nothing had been paid on the note of $85,000.00, and Thibodaux, Trustee, remained in possession thereof.”
 

 This is a suit by the liquidator of the People’s Bank & Trust Company for the annullment and cancellation of the subordination of the bank’s prior mortgage, to the note and mortgage for $85,000 now held by Wiley Thibodaux, trustee, particularly as it affects the items of ¡realty covered by that mortgage. The alleged nullity of the subordination is urged upon several grounds, the controlling-ones being that the subordination was ultra vires, and that it was not authorized in the manner required by law. The answer challenges the nullifying value of the facts alleged in the petition, avers that the subordination was properly and legally authorized and executed, and that there was a just and valid consideration therefor, viz:
 

 “To preserve and protect the bank’s interest in the maintenance of the security value of the realty by which its vendor’s note was secured — it being vital and imperative to that end, that the agricultural lands thereof be continued in cultivation.”
 

 The case was tried on the issues stated, and there was judgment in favor of the plaintiff and against the defendant annulling the subrogation by the People’s Bank & Trust Company, in favor of a mortgage for $85,000, executed by the People’s Sugar Company, Inc., in favor of Wiley Thibodaux, trustee, for the entire amount of said mortgage in excess of $31,001.10 and no further, and ordering the cancellation and erasure from the mortgage records of the parish of Terrebonne of the said mortgage
 
 to the
 
 extent that it is annulled by the judgment, and ordering the defendants to pay the costs of the suit. The plaintiff suspensively appealed from the judgment. The defendants have answered the appeal, and pray that the judgment be amended so as to recognize the validity of the subrogation and the priority of the $85,000 mortgage over the bank’s mortgage, to the extent of $67,337.17. The items which total this sum are the following:
 

 (1) Proceeds from sale of 1925 crop of sugar and molasses, sold in 1926 and advanced the ■ crop of 1926............... $29,132.52
 

 (2) Peed supplies and fuel oil from the crop of 1925 advanced the crop of 1926____ $10,782.44
 

 (3) Freeze insurance collected during 1926 upon the crop of 1925 and advanced the crop of 1926.................... $ 1,922.21
 

 (4)
 
 New and additional money advanced the crop of 1926... $25,500.00
 

 Total ..................... $67,337.17
 

 The learned district judge in a painstaking manner has exhaustively reviewed the facts. He found that the directors of the plaintiff bank did not commit an act ultra vires and beyond their power in subordinating the bank’s vendor’s lien and mortgage to the $85,000 mortgage executed by the People’s ■Sugar Company. He found that the subordination was not a gratuitous surrender of valuable property rights of the bank. We quote from his opinion the following:
 

 “It may be urged that
 
 it was
 
 (ultra vires) because it amounted to alienating assets of the bank without adequate consideration; and because it amounted to showing an unjust and illegal preference by way of security to the' syndicate, to the loss of rights of security belonging to its own creditors, depositors and stockholders.
 

 .“As
 
 to
 
 alienation of assets, or the remission of security, or other concessions to debtors, the question whether or not such action is wise or advantageous or injurious to the just and legal rights of its creditors, deposi
 
 *976
 
 tors and stockholders is a question primarily for the judgment of the directors. To pass upon such propositions or contingencies which are by no means rare in the experience of business or banking enterprises, is one of the duties of the board — indeed, one of the reasons for their existence. But, in the discharge of such function, they must exercise ordinary sound care and judgment, taking into consideration all of the facts, circumstances and contingencies that may relate to or affect the particular problem in hand. They may not, arbitrarily alienate, remit, waive or compound, but should recognize and be guided toy such reasons as would be entitled to consideration in the view of ordinarily careful and prudent business men. • Under given circumstances, a remission of 95% of an acknowledged indebtedness, would not only be permissible, but advisable. As in the case of security being worth a maximum of only 2%, and admittedly worthless (financially) debt- or. Under other circumstancees, such a remission would be a patent swindle.
 

 “It is earnestly insisted that there was no adequate consideration or good business reason for the concession which the (resolution granted the Sugar Co.; that in June, the crop was already planted and largely grown,; that the utmost limit of the bank’s interest therein should have been its completion and that, therefore, a subordination of its note to the extent of funds yet needed for that purpose, was the maximum concession that a due regard for the bank’s welfare and the interest of its creditors, etc, made entertain-able or legally permissible — an amount which subsequently proved to be about $25,500, It is not really admitted that a subordination even to that extent was justifiable. The view seeming to be that, having pitched and worked the crop up to June, the Sugar Co. and its crop backers had more than the bank to lose from a failure to complete and harvest it and that, therefore, the bank should have ‘stood pat’ with its vendor’s mortgage as security; that there was neither reason nor adequate consideration for the subordination of a modicum of its security; and that such concession was an inexcusable lessening of its security, to the unfair prejudice of the bank’s creditors.
 

 “To the casually attentive and imperfectly informed that view has the ring of plausibility. It is not, however, necessarily sound.
 

 “The property covered by the vendor’s mortgage consisted largely of cultivated lands and an operating sugar refinery, the probable eventual selling value of which was sensitively contingent upon their actual status, either that of ‘operating plantations and active refinery,’ or that of ‘abandoned farm lands and a discarded, unkept-up sugar house and équipment.’ A prospective change from the active operating status, to that of ‘weed-, lands’ and a deteriorating, idle factory left to fall into disrepair for lack of raw material with which to operate it, is one calculated to strike apprehensive terror into the heart of not only owners, but of mortgage holders, because of the accompanying
 
 almost instant
 
 fall of probable selling values.
 

 “Especially is this painfully true, where security margin is slender or not existent, at all.
 

 “In the case of sugar plantations, the consequent shrinkage of acreage value might easily range from 25 to 50% while the realizable value of such a sugar house might descend almost to the level of junk. Especially, was that prospect a real probability in the year 1926.
 

 “It follows that unless the holder of a mortgage on such a property has a safe and ample margin of security above the amount
 
 *978
 
 of his note, the prospect of such a shift of status, is not only one of interest, but may well impress him as one of the most vital financial concern — according to the capital he has involved therein, the sufficiency or inadequacy of his margin, and his own finan-, cial ability to absorb or withstand such pecuniary loss as the situation may seem to threaten.
 

 “The slenderer his margin, and the less secure his own solvency, the more ominous and disturbing, the prospect.
 

 “With the impress of these truths in mind, what was the seeming situation of the bank in June, 1926?
 

 “In 1922, it found itself the unwilling and unhappy possessor of the Argyle properties, subject to a priming mortgage of $95,000.00 and interest; in order to maintain itself whole, it needed to realize the equivalent of $375,000 therefor.
 

 “Banks are not in business to deal in real estate and they have no warrant nor incentive to hold such assets, any longer than they can be converted into cash, or disposed of to the best advantage.
 

 “To dispose of such property representing an outlay of such an amount, at an advantage, it should have been sold for $375,000 eash, or on such terms as would have produced either' a sufficient cash payment to constitute a conservative margin of security for the unpaid balance; or (if no cash payment were obtainable) the obtention of sufficient
 
 additional
 
 collateral security,' to insure a reasonable margin of security for the-price. Only on some such terms, could a sale be termed advantageous, if an eventual realization of the entire investment and interest be held in mind.
 

 “The bank accomplished no such disposition of the property. It did not sell for eash. It did not obtain
 
 any cash
 
 in partial payment; nor did it obtain, at the time of sale, any additional security. The fact that it made no such sale is pretty clear evidence that it found it impossible, so to do. Otherwise, it is reasonable to suppose that it would have done so. At any rate, there is no intimation or suggestion that it could then have done any better. The reasonable conclusion is that it made the best sale, possible of negotiation.
 

 “If the bank could
 
 get no more
 
 for it, could obtain
 
 no cash payment
 
 as a margin, and could get control of
 
 no additional collateral
 
 security, the price contracted for ($375,000, including the priming mortgage) must have represented its then
 
 full marketable
 
 value— evidently, and in
 
 excess
 
 of its
 
 then
 
 cash value.
 

 “Being fortified by no margin or additional security, the note accepted by the bank was not classable as ‘gilt-edged,’ or an asset to be regarded as ‘entirely safe’ in banking or business circles. In all probability, its actual cash value in responsible financial circles was even at the moment of execution materially less than its face value.
 

 “Though this status is noted there is nothing to indicate that the bank, could have made, any more advantageous disposition of its unfortunate burden, at that time. The facts merely emphasize the obvious truth that, from that date forward, the bank was bound to be alertly and vitally concerned with, and impressed by, the necessity of the continued operation of the property as a ‘going concern’ until such time as it could, in .whole or in part, be turned into cash sufficient to pay the indebtedness or, at least to create a safe margin of security for any balance due.
 

 “Since there was no margin of security, ■unless the status of a ‘going concern’ were
 
 *980
 
 maintained, every dollar of the inevitable shrinkage in marketable value (attendant upon abandonment and physical deterioration), meant a deduction from the
 
 realizable value
 
 of the vendor’s note. And such a reduction is equivalent to
 
 actual loss.
 

 “Considering the problematical initial accepted value (375,000), a shrinkage of one fourth or one third meant a loss of from ninety and $120,000; or, if the refinery and rights of way be considered alone, independently of the acreage, of the difference between an approach to junk value and its value as an operating unit — perhaps, between $75,000 and $100,000.
 

 “It is thus * * * plainly obvious that, from the very first, the bank could not afford to be indifferent to the cultivation of the plantation and the operation of the refinery. To have assumed that attitude, would have been reckless, if not suicidal negligence of its own interest and that of its creditors, depositors, etc.
 

 “While it is true that in June, 1926, there had been some reduction of the total indebtedness, it is equally true that such reduction had been' accomplished by the alienation of considerable acreage. So that it cannot be concluded that, at that time, the bank’s interest in the maintenance of agricultural operations, had become less imperious than at the beginning.
 

 “Granting, by the way of argument, that the land-selling campaign had not met expectations, and that the ill-success of the sugar company’s operations may have accentuated the probability of an eventual loss to the bank — the properties were, nevertheless, still a ‘going concern’ with the prestige and value attributable thereto, and it was a matter of anxious concern, that there should not be added the deterioration that usually marks disuse.
 

 “If, viewed as a goirig'e'oncern, the prospect indicated the likelihood of
 
 some loss,
 
 it seems clear that the imminent prospect of discontinuation of crop cultivation with its consequent effect upon land values, and the resultant assured idleness and depreciation of the refinery, carried the threat, if not the positive certainty, of an additional immediate further depreciation of the security behind the note — thereby insuring that the contemplated ‘some loss’ might be many times multiplied. Since the possible decrease of security value thus feared might easily, as ¡hereinbefore noted, amount to staggering and ruinous figures, the situation was one that would amply justify any board of directors in seriously considering whether or not good judgment and sound business did not indicate the wisdom of making some
 
 further concession
 
 in a definite amount, rather than risk the pending destruction of values that might attend upon the abandonment of operations by the Sugar Co.
 

 “In that situation, the board not only possessed the right, but was
 
 charged with the duty
 
 of calling into action their most serious thought and judgment. In doing that, if they acted in honest observance of the light as they saw it, and yielded no more than the facts and circumstances (as then known to them), appeared to warrant as reasonable and advisable — the concession being such as might influence men of usual and ordinary ability as banking directors — their action would appear to be within the scope of their authority. Directors are not amenable to censure, merely because the unanticipated course of after-events may
 
 now
 
 indicate that a less liberal course would have been preferable. ‘Hind-sight’ is not a safe
 
 *982
 
 censor of good faith that presided at the moment of
 
 necessary action and decision.
 

 “The record also establishes that, at the time that the bank acquired the Argyle properties, $276,000 was largely in excess of its capital and surplus; that the Commissioner of Banks then regarded the Argyle item as one of danger to the integrity of the bank, and so advised its officials.
 

 “It further shows that, during the several succeeding years, this item continued to constitute the most serious menace to the stability of the bank. The directors were well aware of this overhanging danger, and, as sensible men, must have realized that any drastic shrinkage in the actual marketable value of the property, could well mean the collapse of their institution — a contingency that could mean nothing less than disaster and ruin to all of its creditors, especially depositors, not to mention the stockholders, including themselves.
 

 “Though a shrinkage of value in the Argyle properties might suffice to force the failure of the bank, the disaster
 
 would not be measured by that shrinkage,
 
 alone. The closing of the bank’s doors would accentuate and intensify an already depressed local financial situation, which would, in all likelihood,
 
 still further
 
 lower the realizable value of
 
 yet other
 
 bank assets, with the net result of swelling the ultimate loss of creditors, and depositors to an aggregate figure that might attain several multiples of the actual shrinkage of the Argyle item, alone.
 

 “It was the duty of informed and conservative directors to bear in mind the entire situation, together with all of its unpleasant possibilities.
 

 “It must then be recognized that, notwithstanding the reflection that it was the duty and obligation of the Sugar Co. to finance itself and take care of its own cropping ventures, the situation of the bank, not only did not warrant indifference thereto, but imperatively demanded that it keep a wary eye thereon and avoid a possible collapse, even at the expense of some definite accommodation or concession — rather than challenge an alternative, freighted with very probable destruction and disaster, both to itself and its depositors.
 

 “Manifestly, the subordination was not ultra vires.”
 

 The trial judge found that the directors of the plaintiff bank were not unduly or improperly influenced by any one and that, in subordinating the bank’s lien and mortgage to the $85,000 mortgage of the People’s Sugar Company, they acted from conviction and in the only then possible way open to them to preserve the value of the property affected by its mortgage of $276,000. We might add that no one could foresee the havoc and disaster which followed in the wake of the storm of 1926 which, visited this state shortly before the harvesting season of that year. But for that visitation of Providence this suit might never have been brought.
 

 The evidence, as a whole, is conclusive that the directors of the plaintiff bank and of the People’s Sugar Company acted throughout with the best of motives, without, the concealment of a pertinent fact, and primarily in the interest of the bank. There are many allegations in the petition to the contrary, but our reading of the record convinces us that not a single one is established by proof to the degree of reasonable certainty. We therefore feel that it would serve no good purpose to review- the voluminous record in detail. ' ‘
 

 
 *984
 
 Counsel for defendants concede that the authorities cited in plaintiffs’ brief announce sound legal principles of law, but these principles do not apply when it is made to appear, as in this case, that each of the directors, without exception, acted, under the circumstances presented, with scrupulous regard to his trust as a director of the bank. Good faith, honesty, and fair dealing is what the law requires of the directors of a corporation in the confection of any corporate act. In this connection we cite Sanford Tool Co. v. Howe, Brown & Co., 157 U. S. 317, 15 S. Ct. 621, 39 L. Ed. 716 ; Illinois Steel Co. v. O’Donnell, 156 Ill. 624, 41 N. E. 185, 31 L. R. A. 265, 47 Am. St. Rep. 245 ; Carter v. Brock, 162 La. 12, 110 So. 71.
 

 In considering the extent to which the plaintiff bank subordinated its security in 1926 to the $85,000 mortgage of the People’s Sugar Company, the trial judge says:
 

 “The issue posed is: Whether or not, with the security it still held in June, 1926, the bank was warranted in considering a request to subordinate
 
 yet more
 
 of the security that it
 
 still possessed,
 
 for the purpose of insuring the continued operation of the property as a ‘going concern’ — and thus insure itself against a
 
 still greater
 
 threat of depreciation of the actual value of its security.
 

 “The query must be answered in the affirmative. The Court is of the opinion that the bank directorate honestly believed that such course would eventually result in the settlement of its claim in full; or, at least, more nearly in full than would be the ease if the plantations ceased to be cultivated.
 

 “Upon the other hand, it was bound to realize that a collapse of the Sugar Co. values might and probably would mean the failure of the bank itself. It was in no condition to withstand the possible destruction, to any substantial proportion of its claim against the Sugar Co.
 

 “Between the alternatives, it is not possible, all things considered, to affirm that its action was not conservative and wise.
 

 “At that time, it was not possible to foresee the disastrous storm of Aug., 1926, with its destruction of growing crops and consequent depressing effect upon the financial situation and the stability of banks in- the sugar section — resulting in the failure of the Bank of Lockport-and a resultant run upon the plaintiff bank.
 

 “These things were neither foreseen nor anticipated. In June, 1926, there is now nothing to indicate that the bank directorate anticipated failure; in all probability, the directorate still had faith in the efficacy of its efforts to nurse the^ Argyle properties into a position to take care of its indebtedness, or at least a sufficiently large portion thereof to restore the liquid assets of the bank to that condition that it could escape from the embarrassment descended upon it when it first found itself loaded up with the Argyle item of $276,000 behind a priming mortgage of $90,000.
 

 “Another circumstance - deserving of at least some notice, in the endeavor to visualize the bank’s problem as appeared in June, 1926, is the fact that on that date there seemed to be a feeling that the
 
 then
 
 growing crop (it was then almost ‘lay-by’ time) seemed to be in fairly good condition and to promise a reasonable yield — with the prospect that it could be counted on for at least
 
 some cash return
 
 over and above the harvesting and selling expenses. This hope or expectation was the more natural and reasonable, in that cane crops
 
 usually do
 
 exceed in value the
 
 *986
 
 cost of saving; and of the further fact that the Sugar Co. owned and operated a well equipped refinery and cane transportation railroad system for economical handling of the crop — thus making available to it what is usually referred to as the ‘factory-profit,’ which is never available to the
 
 mere cane-raiser.
 

 “So that, although the crop advancer, as is quite usual, demanded, in addition to a crop lien and privilege, the additional security of a realty mortgage, and both the resolution and the subordination' complied with the demand, it is not likely that either the advancer or the bank board anticipated that the mortgaged, property would, at the end of the harvest, be called upon to respond for the full amount of the crop advances.”
 

 The trial judge found that certain directors of the bank were familiar with facts which were not disclosed to the board when the resolution subordinating the bank’s mortgage to the mortgage of the People’s- Sugar Company was adopted, and for that reason held that members of the syndicate who did not occupy a fiduciary relation to the bank were protected by the subordination.
 

 We have found that all of the directors acted in good faith, that their acts were not ultra vires, but were prompted by a sincere desire to protect the interests of the bank and to maintain the value of its securities. It is shown that the syndicate is actually out the full sum of $67,337.17 advanced upon the crop of 1926, and we think defendants are entitled to judgment for that amount.
 

 Eor these reasons it is decreed that the judgment be amended by increasing the amount thereof to $67,337.17, and as thus amended that it be affirmed at appellants’ cost.
 

 ST. PAUL, J., takes no part