OPINION
MERRITT, Circuit Judge.
SUMMARY
In this oil and gas case arising from the Chapter 11 bankruptcy of an operator of oil and gas wells, the primary question involves the ranking of liens under Louisiana law. The appellants (herein referred to as “investors”) are investors holding minority working interests in the wells, and the appellees are creditors who made loans to the debtor. The specific issue before the Court is the priority between the investors’ claims, which are based on hens authorized in an Operating Agreement with the operator but not perfected through proper recordation, and the creditors’ claim, which arose later in time but is based on a properly recorded security interest.
I.
The parties in this case are linked through their relationship with Century Offshore Management Corporation. Century drills, develops, and operates oil and gas wells on submerged federal lands in the Gulf of Mexico. Its lease interests include a block of land located in the West Cameron area off the coast of Louisiana known as WC 368.
The appellants are investors in Century wells. They hold working, non-operating interests in WC 368. In 1987 Apache Corporation and Century entered into an Operating Agreement concerning WC 368. Some time after 1990, K.E. Resources, Ltd. and Nuevo Energy Corporation joined Apache as non-operating working interest holders and became parties to the Operating Agreement. The parties did not record this Operating Agreement in the local parish records.
Under the Operating Agreement’s terms, Century owns a 62.88% interest in the WC 368 lease; Apache owns an 8.33% interest; K.E. Resources has a 26.95% interest; and Nuevo Energy holds a 1.83% share. Each party receives a pro rata share of the proceeds under the lease, and is responsible for a pro rata share of the operating costs. Century, as the operator, is to pay initially the operating costs and collect the production proceeds, and then allocate these costs and proceeds among the other interest holders. The Operating Agreement provides for reciprocal liens in the event that any party fails to pay its share of the operating costs: If a party fails to pay, the other parties must cover its share on a pro rata basis, and are granted a lien on the non-paying party’s interest in the production revenues. See Operating Agreement (J.A. at 66).
In 1990, Century Offshore entered into a financing agreement with the appellees, BMO Financial and Bank of Montreal. BMO granted Century a $45,000,000 revolving loan, secured by a mortgage and a security interest in certain of Century’s assets, including its interest in WC 368. BMO recorded its interest and perfected a lien on the property. The agreement, however, specifically and expressly provided that BMO’s interest was “subject to” certain encumbrances, including the WC 368 Operating Agreement. In particular, the Mortgage provides that the property is free of all “liens, encumbrances, security interests, contracts, agreements, preferential purchase rights, unitization agreements or unitization orders or limitations of any nature or kind ... except those Encumbrances which may be specified herein or on Attached Exhibit A.” It also provides that “[tjhis Mortgage is, and always will be kept, a direct first hen, privilege and security interest upon the Mortgaged Property subject only to the Encumbrances described on Exhibit A....” Exhibit A lists the WC 368 lease, and itself acknowledges that Century’s interest in the lease is “subject to” the April 30,1987 Operating Agreement.
*412 In August of 1992, Hurricane Andrew caused extensive damage to Century’s oil and gas production platforms in the Gulf. Century suffered reduced cash flow as a result, and found it increasingly difficult to make regular payments to BMO. Though Century made deductions from the investors’ shares of production revenue, Century also failed to pay suppliers of goods and services for certain operating costs. As a result, these suppliers filed mechanics’ and materialmen’s hens on WC 368.
In August of 1993, Century filed a petition for relief under Chapter 11 of the Bankruptcy Code. Several lawsuits followed. First, BMO began this adversary proceeding against the mechanics’ and materialmen’s lienholders, asking the bankruptcy court to determine the priority of these hens and BMO’s security interest. Second, four of the mechanics’ and materialmen’s henholders sued the investors in federal district court in Louisiana because Century had not paid them since before filing its Chapter 11 petition. The court granted summary judgment in favor of the henholders. Finally, four other henholders brought a similar suit in Louisiana state court, a case that is apparently still pending.
In response to these suits against them, the investors intervened in the instant case. They have since entered into a Forbearance Agreement with the first set of henholders under which they are paying the henholders $30,000 per month to avoid foreclosure on their interest in WC 368. After Sling an intervening complaint, the investors moved for summary judgment, asking the bankruptcy court to rank the hens they obtained through the Operating Agreement superior to BMO’s security interest. The bankruptcy court denied this motion and granted summary judgment sua sponte in favor of the lenders. The district court affirmed and denied the investors’ motion to certify the question of hen priorities to the Louisiana Supreme Court. Both aspects of the district court’s decision are now before this Court.
II.
As an initial matter, the investors contend that when faced with their own summary judgment motion, the bankruptcy court improperly entered summary judgment peremptorily for BMO. They note that though they asked the court only to recognize that their interests were superior to those of BMO and other defendants, the court ranked all the claims in the bankruptcy case. They contend that an evidentiary hearing was required and that the bankruptcy court’s procedure deprived them of their due process rights. Holding such a hearing may have resulted in a better decision, but it was not required.
It is true that a district court should only enter summary judgment in the absence of a cross-motion with great caution. Ledford v. Tiedge (In re Sams), 106 B.R. 485, 491 (Bankr.S.D.Ohio 1989). On the other hand, the fact that the nonmoving party has not filed its own summary judgment motion does not preclude the entry of summary judgment if otherwise appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); Ledford, 106 B.R. at 491 (“Federal Courts have long recognized that if there is no genuine issue as to any material fact the court may enter summary judgment, sua sponte.”). In the instant ease, the parties fully briefed the determinative issue, and the investors concede that there are no facts at issue. Appellants’ Br. at 7. Further, the nature of ranking bolsters the bankruptcy court’s actions: It seems reasonable to expect the investors to recognize that if their claim is not superior to BMO’s, it is inferior. Thus, summary judgment was an appropriate procedure here.
III.
The sole substantive issue in this case is the priority of claims between the debtor’s co-lessees, the investors, who hold unperfeeted reciprocal liens on the lease through an Operating Agreement with the debtor, and a creditor, who holds a perfected security interest in production proceeds but has expressly acknowledged by contract that its interest is “subject to” various “encumbrances,” including the Operating Agreement.
*413 BMO argues, and the lower courts agreed, that the operation of Louisiana’s recording statutes dictates that its interest is superior. A mineral right is an “incorporeal immovable” in Louisiana. La.Rev.Stat. § 31:18 (West 1996). Incorporeal immovables are subject to a race recording statute: “All sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto.” LaRev. Stat. § 9:2756 (West 1996). Under a race recording statute, a recorded interest is superior to prior unrecorded interests. It is undisputed that BMO secured and perfected its interest but that the Operating Agreement between the investors and Century was not recorded in the local parish as required. See La.Rev.Stat. § 9:2721 (West 1996). Thus, BMO concludes, its interest is superi- or.
BMO argues that the fact that it had actual notice of the Operating Agreement and expressly agreed to be bound by it is irrelevant. It points to authority apparently supporting the proposition that under Louisiana’s race recording statutes a third party may rely on the public records even when it has actual notice of competing claims and even if the unrecorded document is referred to in a recorded one. See Cardinal Federal Savings Bank v. Corporate Tower Partners, 564 So.2d 1282, 1288 (La.Ct.App.1990); Judice-Henry-May Agency, Inc., v. Franklin, 376 So.2d 991, 992 (La.Ct.App.1980).
The investors raise several objections to this line of reasoning. First, they note that BMO acknowledged the contractual rights expressed in the Operating Agreement at the time it took the security interest. Because Century had an obligation to pay operating costs, they argue, it did not really “own” the entire mineral interest, and a party cannot grant a security interest in something he does not own: Thus BMO actually had a mortgage on Century’s net proceeds, less operating costs. Second, they contend that BMO was not a third party with respect to the Operating Agreement, and as a party is bound contractually to its terms. The investors argue that the mortgage incorporated the terms of the Operating Agreement, and thus must be treated as containing its language regarding operating costs. Third, the investors point to the fact that the Fifth Circuit, when faced with facts nearly identical to those of the instant case, applied an equitable exception to the general rule of the public records doctrine. See Grace-Cajun Oil Co. No. 3 v. Federal Deposit Ins. Corp., 882 F.2d 1008 (5th Cir.1989).
We agree with the investors’ position, and hold that their liens are superior to BMO’s. We do not find it necessary to conclude that Century did not actually “own” the entire mineral interest, that BMO was a party to the Operating Agreement, or that the Mortgage incorporated the Operating Agreement by reference. Nor are we willing to adopt all of the Fifth Circuit’s reasoning in Grace-Cajun. Our holding rests on the principle that even if the default rule under Louisiana’s race recording statutes would ordinarily allow a third party with notice—perhaps even actual notice—to rely solely on the public records in ranking its lien, this default rule may be avoided by the parties by contract: The public records doctrine does not prevent the third party from contractually agreeing by express language to subordinate its interest to interests that would otherwise be inferior.
The purpose of the recording statutes at issue here is to allow third parties to deal with immovable property without searching beyond the public records. Our holding does not disturb this basic premise. BMO could simply have relied on the ranking provided by these statutes. Had it done this and recorded its interest first, its lien may well have been superior to the investors’. But BMO did not choose to leave its fate in the hands of the default rule: In three places, its contract with Century (the Mortgage) states that its interest is “subject to” the Operating Agreement. Moreover, the Mortgage refers to the interests to which BMO’s security interest is subject as “encumbrances.” It follows from this language that BMO and Century intended BMO’s security interest to be inferior to the interests created in the Operating Agreement.
BMO contended at oral argument that it did not sign the Mortgage itself, and *414 should not be bound by provisions covering what it characterizes as solely Century’s obligations. We disagree. BMO did sign the Credit Agreement, the centerpiece of the transaction, and is thus bound by the supporting documents as well. See Restatement (Second) of Contracts § 132 (1979) (“The memorandum may consist of several writings if one of the writings is signed and the writings in the circumstances clearly indicate that they relate to the same transaction.”).
The public records doctrine allows third parties to focus on the public records alone when searching for competing claims. In Louisiana, it may even allow third parties to proceed in the face of actual notice of competing claims. See Cardinal Federal, 564 So.2d at 1288; Judice-Henry-May, 376 So.2d at 992. But see Grace-Cajun, 882 F.2d at 1012 n. 3. It does not, however, give third parties permission to ignore concessions that they themselves have made in valid contracts. The Louisiana Supreme Court reached this conclusion in T.D. Bickham Corp. v. Hebert, 432 So.2d 228 (La.1983). The defendant in T.D. Bickham leased space in an office building under a lease that provided: “This lease shall at all times be subject and subordinate to the lien of any mortgage or mortgages now or hereafter placed upon” the office building. See id. at 229. The office building’s owner eventually mortgaged the property, the mortgagee foreclosed, and the plaintiff purchased the property at a sheriffs sale. The plaintiff instituted an eviction proceeding when the defendant refused to agree to new lease terms. The Louisiana Supreme Court acknowledged that under the default rule, a prior recorded lease would entitle the lessee to possession. Id. at 230. The Court determined, however, that the contractual clause reversed the result. It clearly held that a party that would have a superior interest under the default rule could create a different outcome by contract:
Louisiana courts have given effect to contractual provisions altering or modifying the priority of the rights or claims otherwise established by law. See Richey v. Venture Oil and Gas Corp., 346 So.2d 875 (La.App. 4th Cir.1977), cert. denied, 350 So.2d 891, which upheld the validity of a contractual provision subordinating the mortgage to a specified (but subsequently recorded) mortgage. See also Powell v. Superior Pure Ice, 174 La. 891, 141 So. 868 (La.1932); Peoples Bank & Trust v. Thibodaux, 170 La. 969, 129 So. 547 (1930); Odom v. Cherokee Homes, 165 So.2d 855 (La.App. 4th Cir.1964). We see no reason in law or in public policy why an unambiguous provision in a lease between two parties with equal bargaining power cannot validly subordinate that contract to an unspecified future mortgage which is contracted in good faith.
Id. at 231.[1] See also Calcasieu Marine National Bank v. Scarlett Investments, 556 So.2d 911, 912-13 (La.Ct.App.1990) (“In Louisiana, parties are free to alter or modify the priority of rights or claims otherwise established by law.”). In the instant case, though the law might well ordinarily rank BMO’s recorded interest superior to the investors’ unrecorded interests, BMO agreed to subordinate its interest in a valid contract. The fact that BMO agreed to subordinate its interest in a contract with the debtor, and not the investors, does not change the outcome: The T.D. Bickham Court’s analysis did not turn on the possibility that the plaintiff was the original lessee’s successor in interest. BMO’s agreement with Century defined— and limited — the scope of BMO’s interest from its creation. Under the Louisiana Supreme Court’s reasoning, the investors’ interest is superior.
IY.
The investors have asked this Court to certify the determinative issue to the Louisiana Supreme Court. The district court rejected this request, and the investors *415 renew it here. Certification is “most appropriate where the question is new and state law is unsettled.” Transamerica Ins. Co. v. Duro Bag Mfg. Co., 50 F.3d 370, 372 (6th Cir.1995). Supreme Court Rule XII allows certification of a question of Louisiana law to the Supreme Court when the question is determinative of the issue and “there are no clear controlling precedent in the decisions of the supreme court of this state____” La. S.Ct. R. XII; see also La.Rev.Stat. § 13:72 (West 1996); Grubbs v. Gulf Intern. Marine, Inc., 625 So.2d 495, 496 n. 1 (La.1993).
We hold that certification is not required in this case. Louisiana statutes indicate that mineral rights are subject to a race recording statute. However, decisions of the Louisiana Supreme Court also indicate that the holder of an otherwise superior interest may subordinate that interest despite the law’s default rule. Though we do not necessarily agree with the Fifth Circuit’s reasoning in GraeeCajun, we reach the same result on different grounds. This difference in approach is not sufficient to require certification to the Louisiana Supreme Court.
CONCLUSION
For the foregoing reasons, the judgments of the bankruptcy and district courts are REVERSED.

. We note that one of the statutes that was a source for the default rule in T.D. Bickham, La Civ.Code Ann. art 2733, specifically noted that a lessee retains the right to possession "unless there was a contrary stipulation in the contract.” See 432 So.2d at 230. As the quoted material makes clear, however, the Louisiana Supreme Court referred to a general ability to modify the priority of rights otherwise established by law. The fact that the recording statute in the instant case does not expressly contain a similar provision does not make a substantive difference.